**In the Matters of Thomas E. CRIPPIN, Jr., Steven Bruce and Paula Bruce, Debtors.**

**Appeals of P\*I\*E NATIONWIDE, INC., f/k/a Ryder/P\*I\*E Nationwide, Inc.**

**Nos. 87–2855, 87–2926.**

United States Court of Appeals, Seventh Circuit.

Argued April 19, 1988.

Decided June 19, 1989.

Peter Reed Corbin, John E. Duvall, Corbin & Dickinson, Jacksonville, Fla., James M. Mulvaney, Gunn & Hickman, P.C., Danville, Ill., for appellant.

Richard F. Kurth, James K. Borbely, Kurth, Wolgamot & Borbely, Danville, Ill., for appellee.

Before BAUER, Chief Judge,
MANION, Circuit Judge, and WILL,
Senior District Judge.*

MANION, Circuit Judge.

These consolidated appeals present the issue of whether debtors could treat their agreements to participate in an Employee Stock Ownership Plan (ESOP) as an executory contract and reject that contract in bankruptcy (and hence discontinue their participation) pursuant to 11 U.S.C. § 365. The practical effect of rejection in these cases is to allow the debtors to rescind a 15 percent wage reduction they had agreed to as a condition of their eligibility to participate in the ESOP. The bankruptcy court and the district court allowed the debtors to reject their agreements to participate.

We disagree with that conclusion and therefore reverse and remand.

In August 1985, after negotiations with its employees' collective bargaining agent, P*I*E Nationwide, Inc. (PIE) established the Ryder/P*I*E Employee Stock Investment Plan (the "SIP").[1] PIE established the SIP as an Employee Stock Ownership Plan (ESOP) under the Employee Retirement Income Security Act (ERISA), 29 U.S. C. §§ 1001–1461. The SIP was to run from October 7, 1985 through December 1, 1990.

To be eligible to participate in the SIP, an employee had to irrevocably agree to accept a 15 percent wage reduction over the SIP's life. (Some lower-paid employees were required to accept a smaller wage reduction but this detail is unimportant.) In return, PIE agreed to fund the SIP with common stock. Although the SIP participants had no right to back out of the SIP, PIE could terminate the SIP at any time (while allowing the employees to keep their right to shares they had already earned). If PIE decided to terminate the SIP (an event that, to our knowledge, has not occurred), the wage reduction would also end.

Participants were to earn stock on a daily basis; in other words, a participant could receive stock only for days he worked. Each participant had a separate account in the SIP. The SIP trustee was to allocate stock annually into each account based on the proportion that each participant's wage reduction for that year bore to the total wage reduction for all SIP participants. The value of the shares PIE contributed, however, was not directly tied to the amount that employee wages were reduced; in fact, PIE anticipated that the value of the stock it contributed would be substantially less than the value of the wages that the SIP participants relinquished (a fact that the parties confirmed at oral argument).

By establishing the SIP, PIE hoped to stanch substantial losses that it had suffered in 1984 and continued to suffer in

---

* The Honorable Hubert L. Will, Senior District Judge for the Northern District of Illinois, is sitting by designation.

1. PIE was known as Ryder/P*I*E Nationwide, Inc. until 1986. For ease of reference, we will refer to PIE simply as PIE throughout the period relevant to this case.

1985. By requiring employees to accept a wage reduction to participate in the SIP, PIE hoped to reduce substantially its payroll expenses, and thus reduce its overall operating expenses. PIE's management also hoped to increase productivity and efficiency by giving employees a stake in the company.

In October 1985, Steven Bruce and Thomas Crippin, PIE employees, elected to accept wage reductions and to participate in the SIP. Both, however, had difficulties making ends meet on their reduced wages. In October 1985, Bruce and his wife (who we shall refer to jointly as Bruce) filed a Chapter 13 bankruptcy petition. See 11 U.S.C. §§ 1301–1330. Crippin was able to hold out longer but in February 1987 he also filed a Chapter 13 petition.

Chapter 13 offers an alternative to liquidation under Chapter 7 by allowing a debtor with regular income to keep his assets and establish a plan to pay creditors out of his future income. See generally 5 L. King, *Collier on Bankruptcy* ¶ 1300.02 (15th ed. 1988). As part of his plan, a debtor may include provisions rejecting executory contracts that he entered into before bankruptcy, 11 U.S.C. § 1322(b)(7), subject to 11 U.S.C. § 365, the general Bankruptcy Code provision authorizing rejection. As part of their Chapter 13 plans, Bruce and Crippin sought to reject their participation in the SIP as of the date they filed their bankruptcy petitions. By rejecting their future participation in the SIP, Bruce and Crippin sought to avoid the 15 percent wage reduction they had agreed to and to be paid the wages they would have received had they not agreed to the reduction. Bruce and Crippin maintained that the additional income they sought was necessary to fund their Chapter 13 plans. Despite PIE's objections, the bankruptcy court and, on appeal, the district court, allowed Bruce and Crippin to reject their future participation in the SIP as an executory contract and ordered PIE to restore Bruce's and Crippin's wages to pre-reduction levels. See *In re Bruce*, 80 B.R. 927 (Bankr.C.D.Ill.1987) (adopted by the bankruptcy court in Crippin's case and by the district court on appeal in both cases).

We must decide whether Bruce and Crippin could reject their participation in the SIP as an executory contract and force PIE to restore their wages to pre-reduction levels. While Congress has provided that debtors may reject executory contracts in bankruptcy, Congress has not defined exactly what an executory contract is. Attempts to frame a precise definition have been somewhat vexing. See, e.g., *In re Jolly*, 574 F.2d 349, 350–51 (6th Cir.1978), and *In re Executive Technology Data Systems*, 79 B.R. 276, 280–81 n. 5 (Bankr.E.D. Mich.1987), two cases that chronicle the attempts different courts have made to define what an executory contract is. A recurring theme in many courts' definitions, however, has been the idea of mutual obligations. The Bankruptcy Code's legislative history states that the term "executory contract" "generally includes contracts on which performance is due to some extent on both sides." H.R.Rep. 595, 95th Cong., 1st Sess. 347 (1977), *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 6303. A common definition, which this court has cited with approval, states that a contract is executory for bankruptcy purposes where " 'the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure to complete performance would be a material breach excusing the performance of the other.' " *In re Chicago, Rock Island & Pacific R. Co.*, 604 F.2d 1002, 1004 (7th Cir.1979) (quoting Countryman, *Executory Contracts in Bankruptcy: Part I*, 57 Minn.L.Rev. 439, 456 (1973)).

Viewed in isolation, the SIP looks like an executory contract under the mutual obligation approach. The bankruptcy and district courts reasoned that it was because performance remains due on both sides. If a participant did not work, he did not receive stock; and, if PIE did not credit a participant with stock, he would not have to continue working at the reduced wage. See *Bruce*, 80 B.R. at 929. The courts below separated participation in the SIP from the overall employment relationship (despite the fact that both SIP participation and all other employment benefits depend-

ed upon a participant's continuing to work) and in effect treated the SIP simply as a contract to buy and sell stock in the future. In the bankruptcy court's and district court's view, all PIE employees received cash compensation; some (the SIP participants), however, agreed to take 15 percent of their wages and purchase stock from PIE. See *id.* at 929, 931.

■ We think, however, that it was error to treat the SIP as simply a contract to buy and sell stock. Instead, the SIP is a part of PIE's compensation system, and thus an integral part of the entire employment relationship. PIE provides a benefit to Bruce and Crippin by providing them jobs and paying them; Bruce and Crippin in return benefit PIE by working. Although the courts below thought that PIE was required to invest the 15 percent the SIP participants gave up in PIE stock, see *id.* at 929, 931, the stock's value bears no direct relationship to the value of wages the employees give. Also, when the SIP participants agreed to reduce their wages, they also agreed to reduce their wage-based fringe benefits—including incentive compensation, vacation and holiday pay, and short-term disability benefits—because PIE based those benefits on the participants' reduced wages, not on the wages they would have received if they had elected not to participate in the SIP. These facts indicate that the wage reduction really was a wage reduction and not simply part of a contract to purchase stock through payroll deductions. In other words, the SIP was an alternative form of compensation to straight wages.

Bruce and Crippin could not reject the SIP while accepting the other benefits their employment provided them. Allowing debtors to reject executory contracts frees them from burdensome future obligations and thus frees up more assets for creditors. See *In re Jolly,* 574 F.2d at 351. At the same time, rejection constitutes a breach and gives the nonbankrupt party a claim against the debtor. *Id.* But since rejection constitutes a breach, it also excuses performance by the nonbankrupt party. *In re Pacific Express, Inc.,* 780 F.2d 1482, 1486 n. 3 (9th Cir.1986). Thus, rejecting a contract allows a debtor to escape a contract's burdens; but, at the same time, the debtor must also give up any future benefit he might receive from the contract. See *In re Schnabel,* 612 F.2d 315, 317 (7th Cir. 1980).

When a debtor rejects a contract he rejects his obligation to perform under the contract and to receive the benefits that go along with that performance because the burden of performing outweighs the benefits received. Cf. *In re Taylor,* 91 B.R. 302, 310–11 (Bankr.D.N.J.1988) (bankrupt singer rejected contract with recording company to relieve himself of the obligation to record for that company). But Bruce and Crippin want to continue working and to receive all the benefits that go along with working (including having a job). By "rejecting" the SIP, they merely want to receive the wages they would have been receiving had they not elected to participate in the SIP. But at the time Bruce and Crippin elected to participate in the SIP, they had to choose how they wanted PIE to compensate them for their work: by not joining the SIP, they could choose to be compensated strictly in cash (to simplify things, we disregard any other benefits); by joining the SIP, they could choose to be compensated partly in cash and partly in stock to be held in trust for their future benefit. Bruce and Crippin chose to participate in the SIP and thus chose to be compensated in both cash and stock. Bruce and Crippin had no device outside of bankruptcy to force PIE to reinstate their old wage; the only way they could get out of the SIP would have been to stop working or to persuade PIE (through their union) to terminate the SIP. If PIE would not terminate the SIP, and Bruce and Crippin had to quit their jobs to escape the SIP, they would be rejecting much more than the SIP; they would be rejecting their jobs and all other benefits that go with them (including their cash wages). Bruce and Crippin are really asking the courts to change the form of their compensation (and, given the fact that the stock's value is less than the value of the wages they would have otherwise received, to in effect give them a

raise). This the courts may not do. While bankruptcy courts have the power to allow debtors to *escape* burdensome contracts by rejecting them, bankruptcy courts do not have the power to rewrite contracts to allow debtors to continue to perform on more favorable terms. See *In re EES Lambert Assocs.*, 62 B.R. 328, 336 (Bankr.N.D.Ill. 1986). Once they chose to accept cash wages and stock as compensation, Bruce and Crippin could not unilaterally modify their agreement to choose straight wages. Cf. *In re Nashville White Trucks, Inc.*, 5 B.R. 112, 117 (Bankr.M.D.Tenn.1980) (Bankruptcy Code does not grant a debtor greater rights and powers under a contract than he had outside of bankruptcy).

It is true that if PIE terminates the SIP, the wage reduction will end and the SIP participants will receive higher cash wages. But that provision does not make the wage reduction any less a true wage reduction or the SIP any less an alternative compensation system. The termination provision is much like a statement by an employer who has agreed to pay an employee $10 per hour that he might at some time unilaterally decide to pay the employee $12 per hour. The employee in that case could not force the employer to raise his wages; neither may Bruce or Crippin force PIE to compensate them differently by terminating the SIP.

Because participation in the SIP was part of their overall employment relationship that depended upon their continued employment with PIE, Bruce and Crippin could not reject the SIP without rejecting that entire relationship. The bankruptcy court's and district court's decision to, in effect, allow Bruce and Crippin to unilaterally modify their employment agreement with PIE to change the form of compensation they received was error.[2] Therefore, we reverse those courts' judgments allowing Bruce and Crippin to reject the SIP and ordering PIE to pay them higher wages and remand to the bankruptcy court to vacate or modify its orders confirming Bruce's and Crippin's Chapter 13 plans consistent with this opinion.

REVERSED AND REMANDED.

---

2. Given our disposition of the case, we need not reach PIE's contention that the SIP is a spendthrift trust under Illinois law and therefore not part of Bruce's and Crippin's bankruptcy estates.

See 11 U.S.C. § 541(c)(2) (making non-bankruptcy law restrictions on the transfer of beneficial interests enforceable in bankruptcy cases).