**In re Jimmy STARR and Karen Starr, Debtors.**

**DICAP INDUSTRIES, INC., Plaintiff,**

**v.**

**Jimmy STARR and Karen Starr, Defendants.**

**Bankruptcy No. BK 89–40577.**

**Adv. No. 90–0023.**

United States Bankruptcy Court, S.D. Illinois.

April 16, 1990.

Wm. K. Richardson, Law Office of Terry Sharp, Mt. Vernon, Ill., for Dicap Industries, Inc.

Douglas Antonik, Mt. Vernon, Ill., for debtors.

## MEMORANDUM AND ORDER

KENNETH J. MEYERS, Bankruptcy Judge.

This matter is before the Court on the motion of debtors, Jimmy and Karen Starr, to determine the status of a lease agreement entered into with Dicap Industries, Inc. ("Dicap"). Also before the Court is the debtors' motion to dismiss a complaint filed by Dicap in which Dicap seeks to reclaim certain property covered by the lease agreement. Dicap asserts that, since the debtors have not assumed the lease pursuant to 11 U.S.C. § 365, the lease must be deemed rejected and Dicap is entitled to the property under the lease. The debtors contend that the purported "lease" is actually a security agreement and that Dicap is not entitled to reclaim the property subject to the agreement.

On September 14, 1987, the Starrs paid

$5,000 to Bill Anthis[1] for an option to purchase his business, A–1 Towing and Repair, for $75,000. Under that agreement the Starrs had until September 18, 1987, to execute the option by providing collateral and a quit-claim deed to certain real property. The agreement provided that the Starrs could "redeem" the collateral by paying $20,000 in cash and executing a note for the remaining $50,000 by October 31, 1987. The Starrs were unable to obtain the needed financing and so failed to exercise the option.

Anthis agreed to apply the $5,000 payment to a restructured sales agreement. On September 19, 1987, Anthis and the Starrs executed an instrument captioned "Sales Contract." In exchange for the A–1 logo, the telephone lines and listings, and the best efforts of Bill Anthis to retain the former customers of A–1 Towing and Repair, the Starrs were to pay $70,000: $20,000 by October 31, 1987, with the remaining $50,000 to be paid monthly over 5 years at 10% interest. Contemporaneously with the sales contract, the parties executed a standard form Uniform Commercial Code security agreement to secure the $70,000 payment by the Starrs. Incorporated into the security agreement was a sheet captioned "Exhibit A" listing numerous items of automotive repair equipment belonging to the Starrs. Sometime after October 31, 1987, the debtors made the $20,000 "down payment" called for in the sales contract.[2]

On November 9, 1987, for $10.00 and "other good and valuable consideration," the Starrs executed a document captioned "Bill of Sale," by which they sold to Dicap the items listed in Exhibit A of the earlier security agreement, along with additional items handwritten under the original list. On that same date, the Starrs and Bill Anthis, acting on behalf of Dicap, executed an instrument captioned "Lease Contract" which superseded all prior agreements between the parties. That instrument provided that the Starrs would lease the A–1 logo, the telephone lines and listings, and the best efforts of Bill Anthis to retain former customers of A–1 Towing and Repair. The lease agreement incorporated an Exhibit A identical to that in the bill of sale and provided that, in the event of default, Dicap would have the right to enter the premises and take all personal property described in Exhibit A.

Under the lease agreement, the Starrs were to make payments of $1,062.40 per month for 60 months. Additionally, the lease contained a clause giving the Starrs the option to purchase the items listed in Exhibit A at the end of the lease term for $500. At trial, Bill Anthis stated that these items had a value of between $15,000 and $20,000. Anthis further stated that he presumed upon entering into the agreement that when all lease payments had been made, the property would become the property of the Starrs. The Starrs made the monthly payments until they filed their Chapter 11 bankruptcy petition on June 9, 1989.

The Starrs, as debtors, now contend that the lease is actually a security agreement, which is not subject to the provisions relating to "unexpired leases" under the Code. Dicap asserts that the agreement is a valid lease which must be assumed or rejected by the debtors pursuant to 11 U.S.C. § 365. Since the debtors have failed to assume the lease, Dicap maintains that the property covered by the lease must be returned to Dicap as lessor.

Section 1–201(37) of the Uniform Commercial Code supplies the standards to be used to distinguish a true lease from a security agreement. That section provides in pertinent part:

> Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security,

---

1. The original option and sales agreements were executed by Anthis personally; however, the later "lease" agreement, which is at issue here, was executed by Anthis as agent for Dicap.

2. Anthis testified that the Starrs failed to make the $20,000 payment by October 31, 1987, but that they paid this amount "at the time the other agreement was entered into." Presumably, he was referring to the "lease contract" executed on November 9, 1987.

and (b) *an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security.*

Ill.Rev.Stat., ch. 26, par. 1–201(37) (emphasis added).

Under the literal terms of section 1–201(37), if a lease contains an option to purchase that allows the lessee to become the owner of the property for a nominal consideration at the end of the lease term, the lease is in effect a security agreement. See *In re C. Schmidt Trucking, Inc.*, 76 B.R. 129 (Bankr.S.D.Ill.1987): *In re Triple B Oil Producers, Inc.*, 75 B.R. 461 (Bankr. S.D.Ill.1987). In the instant case, the lease contract granted the lessee the option to purchase between $15,000 and $20,000 worth of property at the end of the lease for $500. This is clearly a nominal sum in relation to the value of the property. Accordingly, application of section 1–201(37) indicates that the parties' agreement was in fact a security agreement rather than a lease.

Dicap attempts to distinguish the parties' transaction from a situation in which a lease is a disguised security agreement for the conditional sale of goods. *See In re Loop Hospital Partnership*, 35 B.R. 929 (Bankr.N.D.Ill.1983). Dicap argues that the agreement here did not create a security interest in the personal property included in the lease because Dicap did not actually sell the property to the Starrs. Dicap observes that it did not own the property prior to November 9, 1987, but, rather, that it acquired title to the property by the debtors' bill of sale executed contemporaneously with the lease contract. Dicap argues that because the transaction was not a sale, it must be a true lease.

In making this argument, Dicap divides the parties' transaction into two components and focuses on the component that can be viewed in its favor. First, there was the "lease" of the business itself, which Dicap acknowledges was intended as a financing device rather than as an actual lease. By this transaction, the Starrs acquired the A–1 logo and the business' telephone lines and listings. Second, there was the "lease" of the personal property, which Dicap argues was a true lease. Dicap is correct that, viewed alone, this latter transaction cannot be a sale. However, in arguing that there must be a sale to create a security interest in property, Dicap ignores the fact that a security interest can be created in property other than as an incident of a sale.

The transaction here must be viewed in its entirety. It is inconceivable that the parties would have entered into a separate sale-leaseback of the personal property exclusive of the sale of the business. The purpose of the sale-leaseback of the personalty becomes apparent when the lease contract is compared with the original sales contract that it was meant to replace. The terms are identical. Both instruments provide for monthly payments of $1,062 for a period of five years.[3] Both instruments conferred upon Dicap a security interest in the personal property. The sales contract accomplished this by a contemporaneous standard form security agreement covering most of the items of personal property included in the lease. Similarly, the lease contract by its terms provided for Dicap to take possession of the property upon default by the debtors.

It is significant that the lease contract made no provision for return of the subject property upon expiration of the lease term. This, along with Anthis' testimony that he presumed the property would belong to the Starrs once all lease payments had been made, indicates that the entire transaction was a financing device for the sale of the business rather than a lease of the personal property.

---

**3.** The lease contract provided for monthly payments of $1,062.40 for a period of 60 months. The sales contract provided that the $50,000 principal amount be paid monthly in payments of between $1,000 for $1,300 over a period of not to exceed five years. Interest was to accumulate at 10% annually. The present value of $50,000 payable over five years at 10% interest results in equal monthly payment of $1,062.35.

As stated in *Loop Hospital*, "The parties cannot change the legal effect of an instrument simply by giving a name to it." 35 B.R. at 932. However, this is exactly what the parties here attempted to do by entering into a "lease" contract that contained essentially the same terms as their prior sales agreement. Based upon section 1–201(37), the Court finds that the "lease contract" was actually an agreement granting a security interest in the personal property and that the debtors were not required to assume or reject it as an "unexpired lease" under 11 U.S.C. § 365. Accordingly, Dicap's complaint to reclaim the property under the agreement should be dismissed.

IT IS ORDERED that the debtors' motion to dismiss Dicap's complaint for reclamation of property is GRANTED.