**INTERNATIONAL TRADE ADMINIS-TRATION, and Home & City Savings Bank, Plaintiffs,**

**Home & City Savings Bank, Plaintiff–Appellant,**

v.

**RENSSELAER POLYTECHNIC INSTI-TUTE, Defendant–Appellee.**

**No. 649, Docket 90–5049.**

United States Court of Appeals, Second Circuit.

Argued Nov. 19, 1990.

Decided June 26, 1991.

Richard L. Weisz, Albany, N.Y. (Paul I. Perlman, Hodgson, Russ, Andrews, Woods & Goodyear, of counsel), for plaintiff-appellant.

Joseph Zagraniczny, Syracuse, N.Y. (Jonathan B. Fellows, Bond, Schoeneck & King, of counsel), Miriam M. Netter, Esq., Troy, N.Y. (Pattison, Sampson, Ginsberg & Griffin, of counsel), for defendant-appellee.

Before VAN GRAAFEILAND and WALKER, Circuit Judges, and DEARIE, District Judge.*

WALKER, Circuit Judge:

Home & City Savings Bank (the "Bank") appeals from an order of the United States District Court for the Northern District of New York (Hon. Con G. Cholakis, *Judge*) affirming an order of the United States Bankruptcy Court for the Northern Dis-

---

* The Honorable Raymond J. Dearie, United States District Judge for the Eastern District of New York, sitting by designation.

trict of New York (Hon. Justin J. Mahoney, *Bankruptcy Judge*) which denied a motion by the trustee in bankruptcy of the debtor corporation for an extension of time within which to assume or reject an unexpired lease of nonresidential real property under 11 U.S.C. § 365(d)(4). The Bank raises three issues in this appeal: (1) whether the Bank, which held a mortgage on the debtor's leasehold interest, has standing to appeal; (2) whether 11 U.S.C. § 365(d)(4) applies to this case; and (3) if it does apply, whether the lessor has waived its rights to reclaim the property or should be equitably estopped from doing so. We agree with the district court's finding that the Bank has standing. However, we find that § 365(d)(4) does not apply to the lease in this case. We therefore reverse without reaching the equitable estoppel and waiver issues.

## BACKGROUND

On May 26, 1983, Pacamor Bearings, Inc. ("Pacamor") entered into a ground lease for vacant property belonging to Rensselaer Polytechnic Institute ("RPI"). Pacamor planned to construct a ball-bearing manufacturing facility on the land, located in RPI's Technology Park in North Greenbush, New York. RPI hoped to further its own educational objectives by having a manufacturing plant nearby. In December, 1984, Pacamor assigned all of its right, title and interest in the lease to Kubar Bearings, Inc. ("Kubar" or the "debtor"). RPI consented to the assignment.

The ground lease is for a 99 year term and calls for a base rent of $97,830 for the entire term, to be paid in three installments within the first three years of the lease. The lease sets out additional financial obligations for the tenant, which are termed "rent." Specifically, the tenant must pay "all taxes, assessments, water and sewer rents, rates and charges, vault license fees or rentals, levies, license and permit fees and all other governmental impositions and charges" as well as utility charges, or otherwise be in default. The lessor retains the right to approve leasehold improvements and assignments. Upon expiration or earlier termination of the lease, all improvements which the tenant constructs on the land become the property of the landlord.

The Bank lent $3 million to Kubar to finance the construction and equipping of the manufacturing facility on the leased property. Kubar's leasehold interest secured $2 million of the Bank's $3 million dollar loan. By separate agreement with the Bank, RPI agreed to give the Bank notice of any default by Kubar under the lease. In June 1986, after receiving notice of Kubar's default for nonpayment of the third and final installment of base rent, the Bank cured the default by tendering the full balance of $90,560.43 due to RPI.

On October 7, 1986, Kubar and Pacamor jointly filed for reorganization under Chapter 11 of the United States Bankruptcy Code. The debtor remained in Chapter 11 for three years until it converted to Chapter 7 on November 13, 1989.

On January 10, 1990, the trustee in bankruptcy, more than three years after the debtor had filed for Chapter 11, petitioned the United States Bankruptcy Court for the Northern District of New York for an extension of time in which to assume or reject the ground lease under the terms of 11 U.S.C. § 365(d)(4) of the Bankruptcy Code. This provision normally allows only 60 days after a Chapter 11 filing in which to assume or reject a lease. On February 27, 1990, the bankruptcy court denied the motion. The trustee did not appeal the bankruptcy court's decision. However, the Bank and the International Trade Agency of the United States Department of Commerce, which had guaranteed a portion of the Bank's loan, did appeal to the district court. The district court affirmed. The Bank alone filed this appeal from the district court's decision and order.

## DISCUSSION

### 1. *Standing*

RPI argues that the Bank lacks standing to appeal since it was not a party to the bankruptcy proceedings and since the trustee in bankruptcy, who brought this

action in the bankruptcy court, has not appealed.

We must initially consider whether the issue of standing is properly before us. For the first time at oral argument, the Bank contended that we are precluded from considering the standing question because RPI failed to raise lack of standing as an alternate ground for affirmance by way of cross-appeal. We disagree. It is "'an inveterate and certain'" rule that a party need not cross-appeal in order to assert an alternate ground based on the record to support a district court decree. *Massachusetts Mutual Life Ins. Co. v. Ludwig*, 426 U.S. 479, 480, 96 S.Ct. 2158, 2159, 48 L.Ed.2d 784 (1976) (per curiam) (quoting *Morley Co. v. Maryland Cas. Co.*, 300 U.S. 185, 191, 57 S.Ct. 325, 328, 81 L.Ed. 593 (1937)); *see also Dandridge v. Williams*, 397 U.S. 471, 475–76 n. 6, 90 S.Ct. 1153, 1156–57 n. 6, 25 L.Ed.2d 491 (1970); *University Club v. City of New York*, 842 F.2d 37, 39 (2d Cir.1988); *In re Application for Appointment of Independent Counsel*, 766 F.2d 70, 75 (2d Cir.), *cert. denied*, 474 U.S. 1020, 106 S.Ct. 569, 88 L.Ed.2d 554 (1985). We therefore turn to the question of whether the Bank has standing.

Under the terms of § 365(d)(4) of the Bankruptcy Code, only the trustee in bankruptcy can move to assume or reject a lease. Thus at the bankruptcy court's hearing on the trustee's motion for an extension of time to assume or reject, the Bank did not appear as a party, stating instead that it was "supporting" the trustee's application. RPI argues that because the Bank was not a party and did not formally intervene at the bankruptcy hearing under Fed.R.Bankr. 2018 which governs permissive intervention, it now lacks standing to appeal. RPI, however, misinterprets the standing inquiry.

In contrast to the former Bankruptcy Act of 1938, the Bankruptcy Code of 1978, 11 U.S.C. § 101 *et seq.*, does not contain an express statutory directive on who has standing to appeal from a bankruptcy court's order. Given this lack of statutory authority, the Second Circuit has adopted the general rule, loosely modeled on the former Bankruptcy Act, that in order to have standing to appeal from a bankruptcy court ruling, an appellant must be a "person aggrieved"—a person "directly and adversely affected pecuniarily by" the challenged order of the bankruptcy court. *In re Cosmopolitan Aviation Corp.*, 763 F.2d 507, 513 (2d Cir.), *cert. denied* 474 U.S. 1032, 106 S.Ct. 593, 88 L.Ed.2d 573 (1985) (citations omitted); *see also In re Fondiller*, 707 F.2d 441, 442 (9th Cir.1983); *In re Goodwin's Discount Furniture, Inc.*, 16 B.R. 885 (Bankr.App. 1st Cir.1982); *In re E.C. Ernst. Inc.*, 2 B.R. 757, 760 (S.D.N.Y. 1980); *cf.* 11 U.S.C. § 1109(b) (granting right to be heard in chapter 11 cases to creditors).

In the instant case, the Bank holds a $2 million secured interest in the disputed lease. Without any doubt, it would be "directly and adversely affected pecuniarily" by our affirmance of the challenged bankruptcy order. *In re Cosmopolitan Aviation Corp.*, 763 F.2d at 513. We therefore find that the Bank qualifies as a "person aggrieved" and has standing to bring this appeal.

We reject RPI's argument that the Bank nonetheless lacks standing because it failed to intervene in the bankruptcy court pursuant to Bankr.R. 2018. That rule, governing permissive intervention, does not limit the rights of a "person aggrieved" to be heard. Rather, it provides a formal mechanism that expands the right to be heard to a wider class than those who qualify under the "person aggrieved" standard. *See* Fed.R.Bankr. 2018(a) (allowing permissive intervention to "any interested party," not just "person aggrieved"); *cf. In re Marin Motor Oil, Inc.*, 689 F.2d 445, 454 (3rd Cir.1982) (creditors have right to be heard under 11 U.S.C. § 1109(b), applicable only to chapter 11 cases; need not intervene formally), *cert. denied* 459 U.S. 1206, 103 S.Ct. 1196, 75 L.Ed.2d 440 (1983). Although RPI points to two cases which held that parties who failed to intervene formally in bankruptcy proceedings were barred from later appealing the bankruptcy ruling, those cases do not alter the general rule

that a "person aggrieved" has standing to appeal whether or not they sought intervention. Rather, in determining standing in *In re Central Ice Cream Co.*, 62 B.R. 357 (N.D.Ill.1986), the court considered the debtor corporation shareholder's failure to intervene only after it made its initial determination that the shareholder was not a person aggrieved. In *Cotton v. Bank of New York*, 87 B.R. 272, 274 (W.D.N.Y. 1988), the other case RPI relies upon, the court made no determination as to whether the appellant shareholder was a party aggrieved. Therefore, we find, in keeping with the general rule of *In re Cosmopolitan Aviation Corp.*, 763 F.2d at 507, that "persons aggrieved" have a general right to appeal and need not formally intervene to preserve that right.

## II. *The Applicability of § 365(d)(4) to This Agreement*

A central question in this case is whether the lease was terminated by operation of law under Bankruptcy Code § 365(d)(4), or whether the "lease" was something other than a "true lease," rendering § 365(d)(4) inapplicable. Section 365(d)(4) provides:

> "[I]f the trustee does not assume or reject an unexpired lease of nonresidential real property under which the debtor is the lessee within 60 days after the date of the order for relief ... then such lease is deemed rejected, and the trustee shall immediately surrender such nonresidential real property to the lessor." 11 U.S.C. § 365(d)(4).

Because the trustee did not move to assume or reject the lease within the sixty day statutory time limit, RPI asserts that the lease was terminated by operation of law.[1]

The Second Circuit has interpreted § 365(d)(4) as applying only to a "true" or "bona fide" lease. *In re PCH Associates,*

804 F.2d 193 (2d Cir.1986). Thus, the proper inquiry for a court in determining whether § 365(d)(4) governs an agreement fixing property rights is whether "the parties intended to impose obligations and confer rights significantly different from those arising from the ordinary landlord/tenant relationship." *Id.* at 200. The use of terms such as "lease" or "landlord" and "tenant" does not automatically transform an agreement into a bona fide lease for the purposes of this section of the Code; rather, a court must look to "the economic substance of the transaction and not its form." *Id.*

After examining the economic substance of the transaction, we find that the bankruptcy and district courts erred in concluding that this lease qualifies as a "true" or "bona fide" lease for purposes of § 365(d)(4) of the Code. We therefore hold that it was not rejected by operation of law despite the trustee's failure to move within the statutory time limit.

In two leading cases, courts have held § 365(d)(4) to be inapplicable to ostensible leases or lease-like agreements. In *In re PCH*, 804 F.2d at 193, we considered a complex financing scheme involving a sale-leaseback agreement, in which the transaction was structured as a lease largely in order to secure tax advantages. Suggesting without deciding that the purported lease might be better characterized as a joint venture, a disguised secured financing scheme or some other form of investment vehicle, this Court agreed with both the district court and the bankruptcy court in finding § 365(d)(4) inapplicable because the transaction was not a bona fide lease. In *In re Moreggia & Sons, Inc.*, 852 F.2d 1179 (9th Cir.1988), the Ninth Circuit, citing *In re PCH*, held § 365(d)(4) inapplicable to an agreement in which the City of San Francisco, as part of its urban development, had granted fifty year "use rights" in stalls of

---

1. In this connection, we note that neither party brought to our attention the potential impact of 11 U.S.C. § 348(c) on this case. Section 348(c) provides that § 365(d) "app[lies] in a case that has been converted under section ... 1112 ... as if the conversion order were the order for relief." Kubar, at all times in possession of the property, filed its chapter 11 petition on October

7, 1986, and its case was converted to chapter 7 on November 17, 1989. This raises a question whether the courts below acted correctly in treating October 7, 1986 rather than November 17, 1989 as the starting date for the sixty day limitation period. In view of the result we reach, however, we need not explore this open issue.

a produce terminal to businesses displaced by a city project, charging them rent only until the retirement of the bonds which financed the produce terminal.

The Bank identifies three aspects of the RPI lease which they claim exempt it from the purview of § 365(d)(4): its essentially educational, rather than commercial purpose; its 99 year term; and its pre-paid rent. Upon closer scrutiny, we find that the latter two features, in the context of other circumstances not pointed out by the Bank, compel the result the Bank urges.

■ We reject, however, the Bank's argument that the lease is not a bona fide lease for the purposes of the statute because RPI entered the lease for educational, rather than commercial or profit-oriented goals. To be sure, the lease by its own terms declares the educational goals of the transaction. It states that "[l]andlord's fundamental objective in leasing the Premises ... is to enhance the teaching and research opportunities for its faculty and students by providing them with a close association with technologically-oriented firms." Yet the fact that RPI had an educational objective in entering the agreement does not lead us to the inexorable conclusion that it had no financial objective as well. In fact, with educational institutions, educational goals are often inextricable from financial ones. In entering this lease, RPI may have envisioned that the increased teaching and research opportunities it would provide would lead to enhanced academic standing and prestige and thereby facilitate the receipt of valuable grants and attract more students, faculty and possibly more tuition revenues.

■ Furthermore, even if it were true that the parties entered the contract for *purely* educational reasons, the Bank fails to persuade us that this factor should affect the result of our inquiry under § 365(d)(4). The Bank urges that the legislative history of § 365(d)(4) suggests that the statute should not apply to leases entered into for reasons other than commercial profit, and that Congress' concern in passing the legislation focused on shopping centers and similar commercial centers.

Specifically, the Bank points to Senator Hatch's statement on the Senate floor in support of the measure, in which he referred to the particular need for this legislation to benefit partially vacant "shopping center[s]." 130 Cong.Rec. S8891, S8894–95 (daily ed. June 29, 1984) (statement of Sen. Hatch), *reprinted in* 1984 U.S.Code Cong. & Admin.News 590, 598–99. Certainly, shopping centers were a major concern in passing this legislation. Yet the Senator's statement also explicitly noted that the legislation was not *limited* to shopping centers; rather, he stated it would protect "[t]enants and landlords in *other non-residential structures*". *Id.* (emphasis added). Moreover, the broad language of the statute is inconsistent with the narrow result the Bank urges: § 365(d)(4) states that it applies to "unexpired lease[s] of nonresidential real property." Although the statute's language may not be wholly unambiguous, *see In re PCH*, 804 F.2d at 199, nowhere does it suggest that it is limited to strictly commercial settings and that it excludes leases entered into for educational reasons.

■ Other factors, however, lead us to conclude that this agreement falls outside those contemplated by Congress in enacting § 365(d)(4). There are two unusual aspects of the lease: the 99 year term and the pre-paid rent (over a period of the initial three years) of $97,830. The Bank argues that these distinctive features transformed the agreement from a traditional lease into a pre-paid right of possession for a substantial future term.

■ In *In re PCH*, we noted the bankruptcy court's finding that the potential 165 year term of the lease there represented "an unusually long term for a true lease." The bankruptcy court considered that as one factor in reaching its conclusion that the lease was not a bona fide lease. *In re PCH*, 804 F.2d at 196 n. 3. Although an unusually long term, standing alone, does not automatically signal that an agreement is not a true lease for the purposes of § 365(d)(4), *see In re Fillard Apartments, Ltd.*, 96 B.R. 397 (Bankr.S.D. Fla.1989) (99 year term lease subject to

§ 365(d)(4)); *In re Emory Properties, Ltd.*, 106 B.R. 318 (Bankr.N.D.Ga.1989) (26 year term with option for additional 26 years), we find that in combination with other factors, it may lead to such a conclusion.

In this case, the lengthy term is combined with the unusual pre-paid nature of the agreement. In *In re Moreggia*, 852 F.2d at 1179, the Ninth Circuit held that a lease was exempt from the purview of § 365(d)(4), in part because the agreement had been pre-paid and was no longer executory. Specifically, the court found there were no "current and significant financial obligations"; it explained that because the "obligation to pay 'basic rent' ceased with the retirement of the bonds, the [property] can be used without further payment until the ultimate termination of the Lease...." *Id.* at 1184. The court therefore termed the agreement a "prepaid right of possession for a substantial future term." *Id.*

In the instant case, due to the essentially pre-paid nature of the agreement, the tenant's obligation to pay basic rent had also ceased. While the tenant remained responsible for other financial obligations such as taxes on the land, these obligations were not to RPI, which had already received all the direct financial payments it was due under the entire lease by the time of the bankruptcy.

We do not believe that this is the kind of agreement Congress envisioned as being subject to § 365(d)(4). The legislative history accompanying § 365(d)(4) is scant. Therefore, because § 365(d)(4) does not define the phrase "lease of nonresidential real property," we have previously turned to another section of the Code to clarify Congress's intent in passing this legislation. Specifically, we have looked to § 502(b)(6), where the similar phrase "lease of real property" appears, as a guide in interpreting the meaning of "lease of non-residential real property" in § 365(d)(4). *See In re PCH*, 804 F.2d at 199.

Section 502(b)(6) limits the amount of damages that a landlord can recover upon termination of a lease of real property.[2] The legislative history accompanying

§ 502(b) explains that the phrase "lease of real property" does not apply where the purported " 'lease' involves a sale of the real estate and the rental payments are, in substance the payment of principal and interest on a ... sale." S.Rep. No. 989, 95th Cong., 2d Sess. 64, *reprinted in* 1978 U.S. Code Cong. & Admin.News 5787, 5850. Rather, in such a case, "[t]he 'lessors' are essentially sellers or lenders and should be treated as such for purposes of the bankruptcy law." *Id.*

We find that this agreement resembles an amalgam or hybrid, apparently containing characteristics of both a lease and a sale of property with rights retained in the grantor. RPI wished to receive many of the benefits of a sale of property, such as an early payment, with certain benefits of a lease, such as a continued exercise of a degree of control over the property, evident for example in RPI's continued right to inspect the premises, or its right to approve assignments and improvements. When we analyze this agreement in light of the legislative history of the Bankruptcy Code, particularly the warning in the legislative history of § 502(b) that sales of property disguised as leases must not be subject to the preferential treatment given leases under that section of the Code, we conclude that this agreement should not be treated as a lease for the purposes of § 365(d)(4).

The legislative history of § 502(b) also indicates that "the fact that the lessee assumes and discharges substantially all the risks and obligations ordinarily attributed to the outright ownership of the property is more indicative of a financing transaction than of a true lease. The rental payments in such cases are in substance payments of principal and interest ... on the purchase of the leased real property." *Id.* Certainly, in this case, the lessee did assume and discharge many of "the risks and obligations ordinarily attributed to the outright ownership" of property, such as the payment of property taxes. *See In re PCH*, 804 F.2d at 201 (lessee displayed "significant indicia of ownership"; assumed "many of the obligations associated with outright ownership of the property, includ-

---

2. Pub.L. 98–353, § 445(b)(4) redesignated the former § 502(b)(7) as § 502(b)(6).

ing responsibility for paying property taxes").

■■■ Although we conclude that the indicia of ownership in the lessee are a factor in our decision, we caution that this factor, too, should not be viewed in isolation. To do so would be misleading because of the increasingly common use of "triple net" leases. In a typical triple net lease, the rent stated is "net" to the landlord because the tenant takes responsibility for taxes, operating expenses and the like. *See James v. Commissioner of Internal Revenue*, 899 F.2d 905, 906 (10th Cir.1990) (in triple net lease, lessee is responsible for installation, maintenance, taxes, etc.). This arrangement assures the landlord that he will actually receive the lease's stated profits and that they will not be subject to any expenses other than typical income tax. It may appear in a typical triple net lease, then, that the lessee has assumed many of the responsibilities of ownership. This superficial shifting of costs in a triple net lease, taken alone, should not be interpreted to mean that an agreement is not a lease for purposes of § 365(d)(4). Rather, courts must be careful to look to "the economic substance of the transaction and not its form," *In re PCH*, 804 F.2d at 200, when considering this factor which, depending on the transaction, may be susceptible to different interpretations.

The lease in question here varies from the typical triple net lease, however, because it was essentially pre-paid in nature. Although the tenant did take responsibility for taxes and operating costs as in a typical triple net lease, RPI received the lease's stated profits—the rent paid directly to it— within the first three years of a 99 year term. There were no continuing payments such as would characterize a normal lease. The pre-paid nature of this lease when taken with the other factors at issue here, such as the lengthy term and the allocation of responsibilities between landlord and tenant, leads us to conclude that "the economic substance" of this transaction was closer to a sale for a term of years than to a lease. *In re PCH*, 804 F.2d at 200. We therefore reverse the holding of the bankruptcy and district courts and find that the lease should not be subject to § 365(d)(4).

In reaching the result we do, we are not unmindful of the equities at stake in this transaction. The tenant has pre-paid the lease and constructed a manufacturing facility on the leased premises. RPI has received the substance of its bargained for consideration. To permit it to recapture the leased premises with the manufacturing facility improvements would amount to a "windfall" to RPI. RPI might argue that there is no "windfall" since the property, including the manufacturing facility, reverts to it in 2082 at the end of the 99 year term. However, the windfall is the current value today of the premises improved by a relatively new manufacturing facility, less the "present value" in economic terms of a reverter of the premises in an unknown state of improvement in 91 years. That a present reversion to RPI would be grossly inequitable bolsters our conclusion that § 365(d)(4) does not apply to this unusual transaction. *See In re Moreggia*, 852 F.2d at 1186 (equitable considerations counsel against forfeiture under § 365(d)(4) of vested property interest).

Because we reverse on the basis that § 365(d)(4) does not govern this agreement, we need not reach the questions of whether waiver or equitable estoppel can alter the application of § 365(d)(4) to leases that fall within its purview.

Reversed.