In the Matter of TAK BROADCASTING CORPORATION, Debtor in Possession.

TAK BROADCASTING CORPORATION, Appellant,

v.

TRINITY BROADCASTING OF FLORIDA, INC., Appellee.

TAK BROADCASTING CORPORATION, Appellant,

v.

C.T. ROBERTSON and the Estate of Robert J. Graf, Appellees.

Nos. 91–C–0921–C, 91–C–0922–C. Bankruptcy No. MM 11–91–00032.

United States District Court, W.D. Wisconsin.

Jan. 24, 1992.

Brady C. Williamson, Lafollette & Sinykin, Madison, Wis., for Tak Broadcasting Corp.

Michael E. Kepler, Kepler Law Offices, Madison, Wis., for Trinity Broadcasting.

C.T. Robertson, Ft. Lauderdale, Fla., for C.T. Robertson.

Charles G. Center, Wendel & Center, Madison, Wis., for Robert J. Graf.

## ORDER AND OPINION

CRABB, Chief Judge.

This is a consolidated appeal from the bankruptcy court's denial of appellant's motions to reject what it contends are unexpired leases with appellees. Appellant brought the proceeding in bankruptcy court pursuant to 11 U.S.C. § 365(a), which requires a debtor in possession to choose between assumption or rejection of all of its still-to-be-completed (executory) contracts and its unexpired leases, according to the principle that agreements beneficial to the bankruptcy estate are to be retained and burdensome agreements are to be rejected. Appellant contends that its agreement with appellees to allow them use of its broadcasting tower is a burdensome lease that it should be permitted to reject and that the bankruptcy court erred in not permitting it to do so. This court has jurisdiction over the appeal pursuant to 28 U.S.C. § 158(a) because the bankruptcy court's denial of the motions are final and appealable orders.

I conclude that the "leases" at issue are not true leases within the scope of § 365(a),

and that the bankruptcy court did not abuse its discretion by considering evidence outside the written lease agreement. Therefore, the bankruptcy court's denial of appellant's motions to reject the leases is affirmed.

For the purposes of this appeal only, I find from the record that the following facts are undisputed.

## FACTS

Tak Broadcasting is a Delaware corporation with its principal place of business in Fort Lauderdale, Florida; it is associated with Tak Communications, Inc., a company that owns and operates radio and television stations. Sharad Tak owns both companies and is their president and chief executive officer. Trinity Broadcasting of Florida, Inc. is the successor to Florida Christian Broadcasting, Inc., and is a Florida Corporation that produces Christian broadcasting.

Through complex transactions not relevant to the issue here, appellees Graf and Robertson and appellee Trinity's predecessor Florida Christian Broadcasting all played a part in constructing an approximately 1000 foot high radio tower in Fort Lauderdale. When the tower was completed, Graf and Robertson owned title to the steel used to construct the tower and to Channel 51, a television station that leased space on the tower; Trinity owned the land on which the tower is situated.[1] Several liens for the construction of the tower remained outstanding. It was appellees' hope to use space on the tower for their own stations at no cost to them by renting out the remaining spaces to paying lessees.

At some later time, Robertson and Graf began negotiations for the sale of the tower to Candleabra, the predecessor to Tak Broadcasting Corporation. Candleabra negotiated an option to purchase the tower, but its purchase was delayed. As an incentive to close the deal quickly, Robertson

---

1. Channel 51 was purchased by Robertson and Graf through the Recreation Corporation of America that later assigned its rights to the tower space lease to South Florida Tower Company. Robertson and Graf owned and controlled both companies. It is unclear when and how Robertson and Graf attained a proprietary interest in the tower, but that information is not necessary to determine the issue before the court.

and Graf reserved several spaces on the tower that would not be passed to Candleabra as Candleabra's delay lengthened. Finally, Candleabra acquired the tower, land, and buildings in a series of simultaneous transactions. On January 10, 1973, Candleabra purchased from Florida Christian Broadcasting the property upon which the tower sits. Also, Florida Christian Broadcasting assigned to Candleabra an easement for ingress to and egress from the property. That same day, Candleabra executed an agreement entitled "Tower Space Lease" that provided Florida Christian Broadcasting with one position on the tower space and sufficient space on the land to maintain a television station for a term of fifty years, with an option to extend the lease for "three (3) additional ten (10) year terms and for as many additional ten (10) year terms thereafter as the Antenna Tower or any replacements or substitutes therefor or buildings or structures capable of supporting antenna facilities shall be in existence ..." The lease states in the preamble that

> simultaneously with the execution and delivery of this Lease, Lessee has conveyed to Lessor certain real property hereinafter described, and the parties have entered into other agreements in written form, all as consideration for the Lease; ...

Under the lease, Florida Christian Broadcasting agreed to operate its television station in accordance with Federal Communications Commission standards, to maintain its equipment in good repair, to refrain from interfering with other lessees, and to reimburse Candleabra for its cost of complying with Federal Communications Commission standards. Candleabra agreed to maintain and repair the tower, supporting structures, surrounding buildings and land. In addition, Candleabra agreed to maintain the tower in accordance with legal standards, charging a pro rata amount of the cost of compliance to Florida Christian Broadcasting; to acquire insurance for the tower at reasonable rates; and to pay all taxes levied against the leased premises. At some point after the execution of the lease, appellee Trinity Broadcasting be-

came the successor in interest to Florida Christian Broadcasting and to the lease.

Also on January 10, 1973, appellees Robertson and Graf conveyed to Candleabra all their personal property situated on the land on which the tower is located, including the radio tower. Additionally, Robertson, Graf and Candleabra executed a "Tower Space Lease" similar to the tower space lease between Candleabra and Florida Christian Broadcasting, except that the term of the lease was 20 years, with an option to extend the lease for three ten-year terms. Under the lease, Robertson and Graf paid rent of $1 per year and received three tower space leases, one space reserved to Channel 51 and its successors, another reserved to WAXY–FM 105.9 and its successors, and one occupied by WSHE. Currently, Robertson and Graf receive substantial rental payments from the tower spaces, but pay only $1 per year for controlling the three tower spaces.

Both tower space leases were recorded in the public records of Broward County, Florida, and the bank that financed Candleabra's purchase of the tower and land agreed to subordinate its mortgage to the tower space leases. The fair market value of the tower space leases is at least $155,000 per year.

Robertson assigned his entire interest in the tower space to his wife, Frances Robertson, on December 20, 1983. Graf died on August 5, 1987, and his interest in the tower space passed to his estate. On February 1, 1988, Tak Broadcasting purchased the building and tower from Candleabra, including the two tower space leases with appellees. Tak Broadcasting leases tower space to Tak Communications and other companies in addition to appellees.

On January 3, 1991, appellant Tak Broadcasting Corporation and its associated company, Tak Communications, Inc., filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. They now operate as debtors-in-possession without the appointment of a trustee. On March 29, 1991, appellant filed two motions to reject appellees' leases of tower space. After an

adversarial hearing, the United States Bankruptcy Court for the Western District of Wisconsin concluded that, although the tower space leases were "unexpired leases," they did not fall within the scope of 11 U.S.C. § 365(a), which allows a debtor to reject unexpired leases and executory contracts. Tak Broadcasting appealed to this court, and the appeals were consolidated in an order dated November 13, 1991.

## OPINION

### Bankruptcy Judge's Conclusions

The bankruptcy judge stated that § 365 does not allow rejection of appellees' tower space leases because the leases lack any "material executory character" and because they arose from "an integrated contract which itself cannot be rejected because it is no longer executory either." Specifically, the judge noted that

> I'm troubled by the fact that I cannot come up with a truly accurate other name for it [the tower space lease]. It looks like a lease. It quacks like a lease, if you will, but lacks some of the characteristics of a lease ...

Acknowledging that the tower spaces leases had several characteristics common to a lease, the bankruptcy judge highlighted the unique aspects of the lease that were more like some other property interest: the leases' "exceedingly long terms"; the fact that the lessee could not enforce the minimal obligations of the lessor by withholding payment; and the fact that the leases were consideration for a separate contract that appellant did not seek to reject.

Appellant does not dispute that the leases arose from a larger transaction as consideration for the sale of the tower, land and buildings. Rather, appellant argues

that the evidence of the larger transaction is irrelevant and disputes the bankruptcy judge's construction of § 365 to exclude appellee's tower space leases.

### Consideration of Evidence outside the Written Leases

From the record, it appears that appellant objected on relevancy grounds to the introduction of evidence other than the written tower space leases. In this court, appellant adds as an additional ground for objection the inadmissibility of the evidence under the parol evidence rule. This ground will not be considered because it was not raised before the bankruptcy judge. *See* Fed.R.Evid. 103(a)(1); *see also United States v. Wormick*, 709 F.2d 454, 460 (7th Cir.1983); *In re Jones*, 71 B.R. 682, 685 (S.D.Ill.1987); *Johnson v. Fairco Corp.*, 61 B.R. 317, 320 (N.D.Ill.1986). Appellant's general relevancy objections to the testimony at the hearing did not present the question whether the parol evidence rule applies; the parol evidence rule stems from different considerations and requires an entirely different legal analysis. Appellant does not identify any support for its contention that although it failed to raise the objection before the bankruptcy judge, the objection may be considered on appeal. Therefore, it will not be considered.[2]

■ As to appellant's relevancy objections, they are without merit. Evidence regarding the economic substance of the tower space leases is directly relevant to whether the leases are true leases under § 365, and the bankruptcy judge did not abuse his discretion by considering testimony and evidence that revealed that the tower space leases were one part of a larger transaction. *See In re PCH Assoc.*, 804

2. Even if I were to address this issue, it is doubtful that I would apply the parol evidence rule in this instance. That the parties entitled the agreements "leases" does not end the court's inquiry: the court must determine whether the "leases" are truly leases contemplated by § 365. A court may look behind the form of an agreement to determine its true nature. *See In re PCH Assoc.*, 804 F.2d 193, 197 (2d Cir.1986) (parol evidence allowed where substance of agreements conflicted with the titles the parties chose to give the agreements). In this case,

evidence outside the four corners of the lease is essential to revealing the economic substance of the transaction. Additionally, appellant does not explain how the parol evidence is inconsistent with the tower space leases or why $1 annual rent does not raise an ambiguity about the true nature of the tower space leases. Finally, the leases themselves refer to "other agreements" that were consideration for the lease, making it obvious that the lease agreements were part and parcel of a larger transaction.

F.2d 193, 197 (2d Cir.1986) (evidence regarding history and purpose of lease admitted to determine economic substance of lease).

*Definition of "Unexpired Lease" under § 365*

■ Appellant does not dispute any material facts, but challenges the manner in which the bankruptcy judge interpreted § 365. Since the interpretation of § 365 is at issue, the bankruptcy judge's decision will be reviewed *de novo. In re Hazard,* 113 B.R. 494, 496 (W.D.Wis.1990) (*de novo* review of bankruptcy judge's legal conclusions).

Appellant contends that a "lease is a lease," and that once the bankruptcy judge concluded that the tower space leases were unexpired leases, he should have allowed appellant to reject the leases. In contrast, appellees argue that the tower space leases are not true leases within the meaning and purpose of 11 U.S.C. § 365.

11 U.S.C. § 365(a) permits a debtor to reject unexpired leases and executory contracts, subject to the court's approval.[3] Since the bankruptcy code does not further define "unexpired lease" or "executory contract," and the legislative history behind the terms is scant, the courts have taken a case by case, pragmatic approach to applying the terms. Most courts have included the notion of a continuing or future "mutual obligation" in their definition of executory contracts, *In re Crippin,* 877 F.2d 594 (7th Cir.1989). In other words, "the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure to complete performance would be a material breach excusing the performance of the other." *In re Chicago, Rock Island & Pacific R.R. Co.,* 604 F.2d 1002, 1004 (7th Cir.1979)

(quoting Countryman, *Executory Contracts in Bankruptcy: Part I,* Minn. L.Rev. 439, 456 (1973)) (cited with approval in *In re Crippin,* 877 F.2d at 594).

■ The definition of a "lease" in § 365 has proven even more elusive. Most courts have turned for aid to the legislative history of § 502(b)(6) of the Bankruptcy Code, which limits the damages recoverable for a breach of a lease of real property. The legislative history behind § 502(b)(6) reveals that Congress intended that section to apply to "true" or "bona fide" leases and not to leases that are intended as financing or security devices. 3 Collier, *Collier on Bankruptcy* § 502.02, at 502–63 (15th ed. 1991). The Senate Judiciary Committee explained that

> Whether a "lease" is a true or bona fide lease, or in the alternative, a financing "lease" or a lease intended as security, depends upon the circumstances of each case. The distinction between a true lease and a financing transaction is based upon the economic substance of the transaction and not, for example, upon the locus of title, the form of the transaction or the fact that the transaction is denominated as a "lease."

S.Rep. No. 989, 95th Cong., 2d Sess. 64 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5850; *see* 3 *Collier on Bankruptcy* at 502–63 n. 56.

■ Applying the reasoning behind § 502(b)(6) to § 365, it would be the economic substance of the tower space transactions, not what the parties choose to call the transaction, that determines whether the tower space leases are true leases. Several other courts have taken the "true lease" approach when applying § 365, considering not only the agreement itself but also the surrounding circumstances, the purpose and practical effect of the agree-

---

**3.** § 365 states in relevant part:
(a) Except as provided in sections 765 and 766 of this title and in subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.
Under § 365(g), the rejection of an executory contract or unexpired lease constitutes a breach

of the contract or lease, enabling a lessee or party to a contract to sue for damages. Section 365(h)(1) allows a lessee of real property to remain in possession of the leasehold until the end of the lease's term, with a right to offset against the rent any damages occurring because of the lessor's nonperformance.

ment, and the consideration for the agreement. *See Int'l Trade Admin. v. Rensselaer Polytechnic Inst.*, 936 F.2d 744 (2d Cir.1991) (lease with term of 99 years that provided for prepaid rent over first three years was not true lease under § 365(d)(4)); *In re Moreggia & Sons, Inc.*, 852 F.2d 1179 (9th Cir.1988) (right to possess property with no material future obligation not a true lease for purposes of § 365(d)(4)); *In re PCH Assoc.*, 804 F.2d 193 (sale-lease-back agreement was more accurately characterized a joint venture and not true lease); *In re Starr*, 113 B.R. 481 (Bankr. S.D.Ill.1990) (lease containing option to purchase for nominal amount was security agreement and could not be assumed or rejected under § 365); *In re MCorp Financial, Inc.*, 122 B.R. 49 (Bankr.S.D.Tex. 1990) (lease for commercial real estate was financing agreement and not true lease).

In *Int'l Trade Admin. v. Rensselaer Polytechnic Inst.*, 936 F.2d 744, the Second Circuit Court of Appeals held that a ground lease was not a true lease because it had a ninety-nine year term and provided for a base rent of over $97,000, to be paid within the first three years of the lease. The lease also apportioned responsibility for taxes and other charges to the tenant, and the lessor retained the right to approve improvements and assignments. The court reasoned that one normal characteristic of a lease is the continuing obligation to pay significant rent that bears some relation to the market value of the property leased, *id.*, and that "[t]he use of terms such as 'lease' or 'landlord' and 'tenant' does not automatically transform an agreement into a bona fide lease for the purposes of this section of the [Bankruptcy] Code; rather a court must look to 'the economic substance of the transaction and not its form.'" *Id.* at 748 (quoting *In re PCH Assoc.*, 804 F.2d at 200). The court found that the economic substance of the transaction was "closer to a sale for a term of years than to a lease," and that the lessor had already "received the substance of its bargained for consideration." *Id.* at 751.

Similarly, in *In re Moreggia*, 852 F.2d 1179, the Ninth Circuit Court of Appeals analyzed a lease agreement for a term of fifty years, with a monthly rent tied to the retirement of bonds issued to finance the construction of the building. Once the bonds were retired, monthly rent was no longer required. The court found that the lease was not a true lease within the meaning of § 365(d)(4) because "the basic rental payments were not related to the value of the possessory right," and that the lease agreement was no longer executory because the bonds were retired. *Id.* at 1184. Although mutual obligations remained under the lease—parking and utility charges, taxes, repair and replacement, membership fees—these obligations were not substantial enough to "convert the prepaid right of possession for a substantial future term into an ordinary executory lease with current and significant financial obligations." *Id.* The court noted that the lessee's failure to perform any of the remaining obligations would not entitle the lessor to gain possession of the property because the obligations could be enforced "without resorting to forfeiture of the vested property interest."

Appellant counters that the true lease cases "miss the point" because they involved disguised financing arrangements or can be distinguished from the case at bar. Although the Seventh Circuit Court of Appeals has not ruled on the issue directly, I am persuaded that it would apply a "true lease" analysis to the tower space leases rather than viewing the leases separately from the 1973 transaction. In *In re Crippin*, 877 F.2d at 597, the Court of Appeals for the Seventh Circuit refused to separate an employee stock investment plan from the overall employment relationship. Instead, the court looked behind the document and determined that the investment plan was an inseparable part of the entire employee compensation system, and that the employees could not reject the investment plan "while accepting the other benefits their employment provided them." *Id.* The court refused to classify the plan as an executory contract subject to rejection, reasoning that "rejecting a contract allows a debtor to escape a contract's burdens, but at the same time, the debtor must

also give up any future benefit he might receive from the contract." *Id.* Although *In re Crippin* involved the term, "executory contract," its reasoning is relevant to the term, "unexpired lease." If appellant is permitted to reject the tower space leases, then it will escape the leases' burdens without giving up any material future benefits, namely, rent.

Appellant argues that the bankruptcy judge read § 365 incorrectly when he required that unexpired leases be materially executory. Under this argument, requiring unexpired leases to be executory would render the term "unexpired lease" in § 365(a) redundant and would not make sense because leases lack material executory characteristics as a general rule. Appellant points out that most leases are identical to the tower space leases here: they divvy up responsibilities for maintenance, for the procurement of insurance, for the maintenance of the premises, and for the payment of taxes. To find that the tower space leases are not leases solely because the rent is nominal, appellant predicts, will "read out" the term unexpired lease from § 365. However, it does not require a leap of logic to conclude that a true unexpired lease, like an executory contract, involves mutual obligations and benefits that have not yet been performed or realized. In other words, unexpired leases have some materially executory characteristics, such as the continuing obligation to pay significant rent.

Appellant asserts that the tower space leases are executory because continuing and significant obligations remain for all parties: the maintenance of the tower and stations, payment of insurance, payment of rent (however minimal), payment of taxes, the promise of quiet enjoyment, and the duty to refrain from interfering with other lessors. In essence, appellant is arguing that the tower space leases are true leases, unremarkable except for the nominal rent. If the court were viewing the leases in a vacuum, this argument might be persuasive. However, the tower space leases do not make sense standing alone: why would appellant lease tower space worth $155,000 for $1 per year? The leases themselves answer the question: because "the parties have entered into other agreements in written form, all as consideration for the Lease." In exchange for the tower, land, building and easements, appellees received long-term free "leases" of tower space. The sale and lease occurred simultaneously, and the documents do not make economic sense unless considered together. Whether the transaction is analyzed as prepaid rent or a discounted sales price, appellant received the entire benefit from the transaction at the closing in 1973. The parties' remaining obligations to each other are not material enough to earn the definition of an unexpired lease under § 365; this is a "done deal." To allow appellant to reject the leases and rerent the space at market value would grant appellant a windfall and would be inequitable, since appellees have performed their material obligations in full.

Finally, appellant argues that the lease is a separate agreement from the sale of the tower and land, and, as such, must be analyzed separately under § 365. *See In re Pacific Express, Inc.*, 780 F.2d 1482, 1486 (9th Cir.1986) (if sale of equipment "can be disaggregated" from maintenance agreement, each contract is considered separately under § 365). Appellant analogizes this case to cases in which warranty contracts were found to be executory and rejectable under § 365. *See, e.g., In re Smith Jones, Inc.*, 26 B.R. 289 (Bankr. D.Minn.1982). Here, however, the sale of the land and tower cannot be separated from appellees' right to use space on the tower: the land and tower were exchanged for the spaces. Thus, although the lease agreement is a separate document, it makes no economic sense unless it is considered with the sale of the tower and land. Additionally, unlike a warranty contract, rejection of the leases would allow appellant not only to escape obligations of maintenance and repair, but would also allow appellant to get back what it already sold.

Appellant argues that the true nature of the tower space leases is not relevant because the bankruptcy court found that the tower space leases were unexpired leases.

It appears from the record that the bankruptcy judge concluded that the tower space leases were in fact unexpired leases but that § 365 did not apply because the leases were part of an integrated transaction and lacked executory character. In contrast, I have concluded that the tower space leases are *not* true leases within the meaning of § 365. To the extent the bankruptcy judge's reasoning implies that the leases are true leases within the meaning of § 365, that reasoning is overruled by the opinion here.

### ORDER

IT IS ORDERED THAT the bankruptcy court's denial of appellant's motion to reject appellees' tower space leases is AFFIRMED.