**STORWAL INTERNATIONAL, INC., Plaintiff,**

v.

**THOM ROCK REALTY COMPANY, L.P., Defendant.**

**No. 90 Civ. 6922 (RWS).**

United States District Court, S.D. New York.

July 8, 1991.

---

Stroock & Stroock & Lavan (Brian M. Cogan, Howard M. Hoffmann, J. Michael Williams, of counsel), New York City, Holleb & Coff, Chicago, Ill., for plaintiff.

Dreyer and Traub (Menachem J. Kastner, Kerry E. Connolly, of counsel), New York City, for defendant.

## OPINION

SWEET, District Judge.

Defendant Thom Rock Realty Company ("Thom Rock") has moved pursuant to Rule 56, Fed.R.Civ.P., for summary judgment dismissing the complaint of plaintiff Storwal International, Inc. ("Storwal") in this diversity action for damages arising from an alleged breach of contract. For the reasons set forth below, the motion is denied.

*The Parties*

Storwal is a Canadian corporation engaged in the manufacture and wholesale of steel file cabinetry and pedestals for professional commercial offices (the "office furniture business"). Its principal place of business is in Pembroke, Ontario, Canada.

Thom Rock is a New York limited partnership having its principal place of business in New York, New York. Thom Rock develops and owns real estate.

*Prior Proceedings*

On October 26, 1990, Storwal filed this action seeking a declaration that Thom Rock breached the lease between the parties and damages for breach of contract.

Thom Rock did not answer the first amended complaint. On January 21, 1991, Thom Rock filed the instant summary judg-ment motion. Oral argument was heard on March 26, 1991, and the motion was considered fully submitted as of that date.

*The Facts*

By Agreement of Lease, dated April 23, 1986 (the "Lease"), Storwal and Thom Rock entered into a lease for the rental of premises (the "Premises") at 30–30 Thomson place, Long Island City, New York (the "Building").

The term of the lease was for a ten-year period, commencing on May 1, 1986 and expiring on April 30, 1986.

Paragraphs 2(A), 2(B), 20 and 46(C) of the Lease provide as follows:

2(A)—Tenant shall use and occupy the Premises for the showroom display and sale to the trade, at wholesale only, of the following items and for no other use or purpose: Furniture Systems.

2(B)—Landlord covenants that the Project shall be constructed as a first class commercial building intended to be used for showrooms and other related uses.

20—*No Representations by Landlord.* Tenant expressly acknowledges that Landlord and Landlord's agents have not made, and Tenant, in executing the Lease, is not relying upon, any representations, warranties or promises with respect to the Project, the Building, the Real Property or the premises except as herein expressly set forth and no rights, easements or licenses are acquired by Tenant by implication or otherwise except as expressly set forth herein.

46(C)—This Lease and the attachments hereto shall constitute the entire agreement of the parties hereto; all prior agreements between the parties, whether written or oral, are merged herein and shall be of no force and effect. This lease cannot be changed, modified or discharged orally but only by an agreement in writing, signed by both parties hereto.

The Building was part of a project known as the International Design Center (the "Project"). The Project consists of three buildings. Other tenants of the center occupy premises that consist solely of

glass-facade showrooms for the display of office furniture and related uses.

Beginning in the summer of 1990, Thom Rock leased approximately 160,000 square feet of space of the 400,000 square feet of rentable space in the Building to the New York School Construction Authority (the "NYSCA") for a term of five years. A quasi-governmental corporation created by the New York legislature to design, build, and rehabilitate public school buildings in New York State, the NYSCA does not manufacture office furnishings, is not engaged in the wholesale display of such furnishings and does not purchase products of the kind Storwal manufactures. The NYSCA maintains no showrooms nor any glass facades.

A tenant bulletin of May 2, 1990 published by Thom Rock's agent advised the Project's tenants of the NYSCA lease. The bulletin states that "[w]e realize that you have many questions about the NYSCA and their presence at [the Project]." The remainder of the bulletin refers to the landlord's efforts to continue to attract tenants in the furniture business and also to events designed to draw buyers to the Project. The bulletin states that "[w]e have not altered our objective—to have the design industry centered here."

After NYSCA leased the premises, Thom Rock built a fourth floor pedestrian walkway across the Building's atrium. The walkway bisects the atrium in the Building and terminates just in front of and above the Storwal showroom on the third floor. Before the construction of the walkway, the Storwal showroom was visible from the pedestrian walkways surrounding the fourth and fifth levels of the Building. The walkway now partially blocks the view of the Storwal showroom from many vantage points along the fourth and fifth levels of the building.

*Discussion*

I. *Summary Judgment Standard*

Summary judgment is authorized if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). Summary judgment is ap-

propriate only in the circumstances where "the evidence is such that a reasonable jury could not return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The moving party has the burden of demonstrating the absence of any genuine issue as to all the material facts, and the non-moving party is entitled to all favorable inferences that may be drawn from the evidence. *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 444–45 (2d Cir.1980).

Applying the above summary judgment standards to the instant dispute, Thom Rock has the burden of showing the absence of any genuine issue of fact as to the terms of the Lease. To this end, Thom Rock relies primarily on the integration clauses contained in paragraphs 20 and 46(A) of the Lease, which in essence provide that the Lease, and no other extrinsic representations, represents the parties' entire agreement.

If, however, a contract with an integration clause is susceptible of at least two interpretations, a court can consider extrinsic evidence not to prove different or additional terms, but to aid in interpreting ambiguous terms of such a contract. *Proteus Books Ltd. v. Cherry Lane Music Co.*, 873 F.2d 502, 509 (2d Cir.1989). The determination of whether a contract is ambiguous is a threshold question of law. *Garza v. Marine Transport Lines, Inc.*, 861 F.2d 23, 27 (2d Cir.1988). If a court determines that language is susceptible of two interpretations and is therefore ambiguous, then parole evidence is admissable, not to vary the terms of the lease, but to aid in construing the ambiguous language. *Heyman v. Commerce and Industry Ins. Co.*, 524 F.2d 1317, 1320 n. 2 (2d Cir.1975). If, moreover, the extrinsic evidence regarding the parties' intent is conflicting, then summary judgment is improper. *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 9 (2d Cir.1983).

II. *The Use Restriction Clause*

The instant dispute over whether Thom Rock breached the Lease centers on wheth-

er Paragraph 2(B) is a use restriction clause preventing Thom Rock from leasing space in the Project to tenants other than those who are in the business of the display and sale of office furniture.

### 1. Construction of the Lease

██ Paragraph 2(B) provides that:
2(B)—Landlord covenants that the Project shall be constructed as a first class commercial building intended to be used for showrooms and other related uses.

Restrictive conditions in a lease are to be construed so as to carry out the intent of the parties as shown by the words used, considered in connection with the surrounding circumstances, and such intent must be ascertained from an examination of the whole lease and not from the particular clause alone. *Eagle Spring Water Co. v. Webb & Knapp, Inc.*, 236 N.Y.S.2d 266, 280 (1962) (citing *Schoonmaker v. Heckscher*, 171 App.Div. 148, 157 N.Y.S. 75, *Bovin v. Galitzka*, 250 N.Y. 228, 165 N.E. 273 (1929)).

Construing Paragraph 2(B) with the other provisions contained in the lease, Paragraph 2(A) contains a reciprocal restriction preventing the tenant from using the leased property for purposes other than the display and sale of office furniture:
2(A)—Tenant shall use and occupy the Premises for the showroom display and sale to the trade, at wholesale only, of the following items and for no other use or purpose: Furniture Systems.

Paragraphs 2(A) and 2(B) are furthermore consistent with Paragraph 15 of the Rules and Regulations appended as Schedule I to the Lease. Paragraph 15 provides that the landlord may prohibit advertising which "tends to impair the reputation of the Building or Project or its desirability as a building for showrooms ...".

Other provisions further establish the parties' intent that the tenants of the Project were to be engaged in the same business and that the location of several different office furniture companies in the same Project would result in synergies that could not be achieved if these companies were situated in diverse locations. Paragraph 28(A) provides that the landlord will undertake "a program of advertising and promotional events ... designed to assist and promote the business of the tenants." Paragraph 29 provides that the tenants may establish an advisory committee to assist the landlord with respect to the foregoing "program." Paragraph 28(A), moreover, refers to "business," not "businesses."

Considering the contract as a whole, then, there is ample evidence to support construing of the contract to contain a restrictive use clause: other provisions in the contract (relating to advertising and special events as well as restrictions on the tenants' use of the premises) can be read to anticipate the establishment of the Project as a center for the sale and display of office furniture and these clauses support the interpretation that Thom Rock has a concomitant obligation to lease only to tenants in this business. Therefore, as a matter of law, the meaning of Paragraph 2(B) is at the very least ambiguous.

Nor is *Benjamin Moore & Co. v. Freedomland, Inc.*, 36 Misc.2d 640, 233 N.Y.S.2d 545, *aff'd*, 18 A.D.2d 1137, 239 N.Y.S.2d 531 (1962), which Thom Rock cites in support of its position that Paragraph 2(A) is not a restrictive use clause, dispositive of Storwal's argument that the contract is at the very least susceptible of two interpretations. In *Benjamin Moore*, a tenant in an amusement park sued the landlord for breach of contract on the grounds that the landlord had agreed to an oral restrictive covenant that "Freedomland would be developed and maintained by the defendant as an historical and educational family recreation and entertainment center of unique character to be maintained with dignity and propriety, free from commonplace and vulgar." The lease contained a merger clause. The court declined to hold that the lease obligated the landlord to maintain the amusement park so as to appeal to a certain class of people or to prohibit certain people from visiting the site.

In *Benjamin Moore,* however, unlike in the instant case, the lease did not contain any explicit provision that could be construed as evidence of the plaintiff's view of the parties' intent. The plaintiff therefore sought to vary the terms of the lease, and to this end relied on parole evidence, evidence which was explicitly prohibited under the merger clause. In contrast, Storwal in the instant case relies on provisions that are contained within the lease. Storwal supports its interpretation of such provision as a restrictive use clause with other provisions of the lease. Therefore, Storwal has demonstrated that as a matter of law Paragraph 2(B) is at the very least susceptible of two interpretations.

2. Extrinsic Evidence

As stated above, having shown that as a matter of law that Paragraph 2(B) is susceptible of two interpretations, Storwal may introduce extrinsic evidence to demonstrate an issue of fact as to the parties' intent. *Heyman,* 524 F.2d at 1320 n. 2.

█ In support of its position, Storwal points to the tenant bulletin of May 2, 1990 published by Thom Rock's agent advising tenants of the NYSCA lease. As discussed above, the bulletin states that "[w]e realize that you have many questions about the NYSCA and their presence at [the Project]." The remainder of the bulletin refers to the landlord's efforts to continue to attract tenants in the furniture business and also to events designed to draw buyers to the Project. The bulletin further states that "[w]e have not altered our objective— to have the design industry centered here."

Storwal has also submitted the affidavit of Jim Mills ("Mills"), then the executive vice president for sales and marketing of Storwal. The Mills affidavit states that Mills visited the Project on three occasions and met with and negotiated with Thom Rock's agent about the lease for showroom space for Storwal. Mills states that representatives of Thom Rock's agent told him that the Project would be operated exclusively as a commercial building exclusively for the showroom display and whole sale of office furnishings, and that the Project would be leased exclusively to office furniture manufacturers and suppliers or their representatives.

In support of its summary judgment motion, Thom Rock adduces, through an affidavit of Harvey Schulweis ("Schulweis"), a general partner of Thom Rock, evidence of the negotiation preceding the signing of the lease as support for its position that the merger clause should govern and further that the parties did not intend paragraph 2(B) to be a restrictive use clause. The evidence from the correspondence relating to the negotiation, Thom Rock argues, demonstrates that Storwal did not insist on a stronger wording for Paragraph 2(B) and therefore did not intend Paragraph 2(B) to be a restrictive use clause. This lack of negotiation of Paragraph 2(B), however, cuts both ways. An equally plausible explanation for Storwal's failure to negotiate this point would be its understanding that the parties' intent regarding the exclusive use clause was mutual. Thom Rock, moreover, does not refute directly the evidence from the Mills affidavit of the oral representations made by its agent during negotiations with Storwal.

Thom Rock further argues that even if Paragraph 2(B) is a restrictive use clause, Thom Rock is not in breach of the lease as the lease to the NYSCA is a "related use" within the meaning of the Paragraph 2(B). In support of its position, the Schulweis affidavit states that "upon information and belief" the NYSCA is a potential customer of the office furniture business and has purchased approximately $2 million worth of office furniture from various tenants in the Project. However, as stated above, Paragraph 2(B) is susceptible of two interpretations as to the restrictive use issue. Where the construction of Paragraph 2(B) with other provisions of the lease creates at the very least an issue of fact as to the intention of the parties as to the *use* of the Project, there is similarly an issue of fact as to their intent as to what constitutes a "related use." Therefore, as issues of fact exist as to whether the parties intended a restrictive use clause and what constitutes

a "related use," the motion for summary judgment is denied.

*Conclusion*

For the reasons set forth above, Thom Rock's motion for summary judgment is denied.

It is so ordered.