In re ATLANTIC COMPUTER SYSTEMS, INC., et al., Debtors.

PIECO, INC., fka Petrolgroup, Inc., Appellant,

v.

ATLANTIC COMPUTER SYSTEMS, INC., et al., Appellees.

No. 93 Civ. 5733 (LMM).

United States District Court, S.D. New York.

Aug. 15, 1994.

Geraldine E. Ponto, Crummy, Del Deo, Dolan, Griffinger & Vecchione, Newark, NJ, for Pieco, Inc., fka Petrolgroup, Inc., appellant.

Phillip C. Potter, Jr., Davis, Polk & Wardwell, New York City, for Atlantic Computer Systems, Inc., debtor/appellee.

## MEMORANDUM AND ORDER

McKENNA, District Judge.

By this Order the Court decides an appeal from a final order of the United States Bank-

ruptcy Court for the Southern District of New York, brought by appellant Pieco, Inc., fka Petrolgroup, Inc. ("Appellant" or "Pieco"), pursuant to 28 U.S.C. § 158(a). Appellee/Debtor Atlantic Computer Systems, Inc. ("Appellee" or "Atlantic") filed for voluntary bankruptcy under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101, *et seq.* (the "Code"), on July 5, 1990. In the course of the proceedings below, and pursuant to its plan of reorganization, Atlantic moved for approval of its assumption of certain contractual obligations and its rejection of others, pursuant to 11 U.S.C. § 365(a), and the Bankruptcy Court approved. For the reasons set forth below, the order of the Bankruptcy Court is reversed, and the case is remanded for reconsideration consistent with this decision.

In broad terms, the appeal raises two sets of issues regarding the contractual obligations considered by the Bankruptcy Court: first, whether the contractual obligations were separate and distinct so as to be subject to assumption in part and rejection in part; and, second, whether the obligations were executory (or unexpired leases) within the meaning of 11 U.S.C. § 365(a).

## I.

The appeal arises out of a computer equipment leasing arrangement between Atlantic and Pieco. On June 30, 1988, Atlantic and Pieco entered into Master Lease Agreement No. 0311 ("Master Lease"). Concurrently with the Master Lease, Pieco and Atlantic entered into Equipment Schedule No. 0311–01; the parties subsequently entered into five additional Equipment Schedules, Nos. 0311–02, 0311–03, 0311–04, 0311–05, and 0311–06 (collectively "Equipment Schedules").[1] Contemporaneously with each Equipment Schedule, the parties entered into a flexlease agreement ("Flexleases"), each designated by a number indicating the corresponding Equipment Schedule. Under the terms of the Flexleases, Pieco could lease replacement equipment and/or terminate an equipment lease prior to the end of its initial term, both without penalty. *See, e.g.,* Appellant's Brief ("Pieco Br.") at 4; Brief of Movant—Appellee Atlantic Computer Systems ("Atlantic Br.") at 2. In July 1990, however, Atlantic filed for bankruptcy protection and Pieco has been prevented from exercising its upgrade or termination rights under the respective Flexleases.

The Master Lease, entered into by Atlantic and Pieco on June 30, 1988, contains a so-called "hell or high water" clause that purported to obligate Pieco to make lease payments notwithstanding the existence of set-off rights, counterclaims or defenses, etc.[2] The Master Lease also contemplates and allows the assignment of Atlantic's rights to payment and other benefits of the bargain to third party lenders.[3] In addition, the Master

---

1. The parties entered into the additional Equipment Schedules as follows:

   | Date | Number |
   | --- | --- |
   | January 30, 1989 | 0311–02 |
   | March 17, 1989 | 0311–03 |
   | April 27, 1989 | 0311–04 |
   | September 1, 1989 | 0311–05 |
   | November 7, 1989 | 0311–06 |

   Atlantic App., Exs. 5(B)–(G).

2. Paragraph 15.1 of the Master Lease, the "hell or high water" clause, provides in part:

   THIS IS AN ABSOLUTELY NET LEASE, AND ANY PRESENT OR FUTURE LAW TO THE CONTRARY NOTWITHSTANDING, LESSEE'S OBLIGATIONS TO PAY LESSOR ALL AMOUNTS DUE HEREUNDER IS ABSOLUTELY UNCONDITIONAL AND THIS MAS-TER LEASE SHALL NOT TERMINATE BY OPERATION OF LAW OR OTHERWISE, NOR SHALL LESSEE BE ENTITLED TO ANY ABATEMENT, REDUCTION, SET–OFF, COUNTERCLAIM, DEFENSE, INTERRUPTION, DEFERMENT, RECOUPMENT, OR DEDUCTION WITH RESPECT TO ANY MONTHLY RENT OR ANY OTHER SUM PAYABLE HEREUNDER, NO MATTER HOW, WHEN, OR AGAINST WHOM ASSERTED, ARISING, OR CLAIMED, NOR SHALL ANY OBLIGATION OF LESSEE HEREUNDER BE AFFECTED FOR ANY REASON WHATSOEVER.

   Atlantic App., Ex. 5(A) ¶ 15.1.

3. Paragraph 15.2 of the Master Lease provides in part:

Lease contains an integration clause that states as follows:

> The Master Lease constitutes the entire agreement between Lessor and Lessee with respect to the subject matter hereof. No term or provision hereof may be changed, waived, amended or terminated except by a written agreement signed by both Lessee and Lessor.

*Id.* ¶ 23.[4]

Each Equipment Schedule expressly incorporates the terms of the Master Lease[5] and provides supplemental terms concerning the leased equipment, including the type and quantity of the equipment, the rental rate, and the commencement date and duration of the respective Equipment Schedule. Atlantic App., Exs. 5(B)–(G). The Equipment Schedules do not contain an integration clause other than the one incorporated by reference to the Master Lease. *Id.*

The Flexleases cross reference both the Master Lease and the Equipment Schedules in the integration clause set out below:

> The terms and conditions of this Master Lease have been fixed by Lessor in anticipation of Lessor's ability to sell and assign its interest or grant a security interest in each Equipment Schedule and in the Equipment in whole or in part to a lender (the "Secured Party") for the purpose of securing a loan to Lessor. Lessor may also sell and assign its rights as owner and Lessor of the Equipment to an assignee (the "Assignee" and, together with the Secured Party, hereinafter collectively referred to as "Assigns"). After any such assignment, the term Lessor shall mean and include such Assigns, unless the terms of this Master Lease expressly provide otherwise. Lessee hereby consents to and shall acknowledge such assignment as shall be designated by written notice given by Lessor to Lessee....
>
> *Id.* ¶ 15.2.

**4.** Atlantic asserts that this provision indicates that no documents other than the Equipment Schedules and the Master Lease may be read to alter the terms of each lease. Atlantic Br. at 6. This interpretation is not persuasive, however. Even by its terms, Paragraph 23 of the Master Lease allows for amendment by "written agreement signed by both Lessee and Lessor." Because the Flexleases, for instance, were so signed, they would appear, all else being equal, to qualify as an amending document. Atlantic has offered no basis for finding that the Flexlease could not so alter the Master Lease.

**5.** Paragraph 6 of each Equipment Schedule provides as follows:

> This Agreement constitutes the entire agreement between Lessee and ATLANTIC; supersedes all prior agreements, other than the Master Lease and the Equipment Schedule, between Lessee and ATLANTIC concerning the subject matter covered by this Agreement; may not be modified except in writing signed by Lessee and ATLANTIC; and shall constitute a separate agreement between the parties and not an amendment to the Equipment Schedule.

*Id.* ¶ 4.

The "flex" rights in the equipment granted by Atlantic to Pieco under the Flexleases allowed Pieco to terminate and/or upgrade its equipment under the corresponding Equipment Schedule. Pieco's enjoyment of the rights in the Flexleases was conditioned upon (1) Pieco's granting of six months' prior notice to Atlantic; (2) the return of Atlantic's equipment in good condition; and (3) Pieco's not being in a status of ongoing default.[6]

> All of the terms, covenants and conditions set forth in the Master Lease Agreement are incorporated herein by reference as if the same had been set forth herein in full.

Atlantic App., Exs. 5(B)–(G). Each Equipment Schedule is identical in form.

**6.** The relevant clause in Flexleases Nos. 0311–01 through 0311–04 provides as follows:

> After a period of forty-eight (48) months of the Term of the Equipment Schedule has elapsed, [Flexlease 0311–04 provides for a thirty-eight (38) month period] ATLANTIC will arrange for the Equipment Schedule to be terminated at no penalty to Lessee, as provided below, subject to the following terms and conditions:
> (i) six (6) months prior written notice having been given by Lessee to ATLANTIC at its New York office;
> (ii) the return of the Equipment in good condition (normal wear and tear excepted); and
> (iii) no Event of Default has occurred and is continuing.
> These terms and conditions having been duly observed, ATLANTIC will settle in full all further rental and other charges due from Lessee under the Equipment Schedule.

Atlantic App., Exs. 5(B)–(E) ¶ 1.
Flexleases Nos. 0311–01 through 0311–04 also provide for upgrades after periods of twenty-four (24), thirty-six (36), thirty-six (36), and fourteen (14) months, respectively. *Id.* ¶ 2.
The relevant clause of in Flexleases Nos. 0311–05 and 0311–06 provides in part:

> After a period of forty-eight (48) months of the Term of the Equipment Schedule has elapsed,

On December 29, 1989, Pieco advised Atlantic by letter of its intention to exercise its rights to upgrade equipment under the Flexleases corresponding to Equipment Schedules 0311–01 and 0311–04. Atlantic App., Ex. H. Pieco notified Atlantic that the upgrades were to be effective June 30, 1990. *Id.*

By letters dated May 25, 1990 and June 6, 1990, Pieco gave notice to Atlantic as well as its presumed assignee, First Bank National Association, of Pieco's purported termination of the Master Lease in light of Atlantic's failure to honor Pieco's demands under the Flexleases. Atlantic App., Ex. 5(I). Pieco asserts that this notice was sufficient to terminate all the agreements—the Master Lease, and all of the Equipment Schedules and Flexleases—in light of Atlantic's ongoing defaults. Pieco Br. at 15; Appellant's Reply Brief ("Pieco Reply") at 8.

Atlantic states, however, that only the flex options which correspond to Equipment Schedules Nos. 0311–01 and 0311–04 matured prior to Atlantic's Chapter 11 filing.[7] Therefore, Atlantic argues, Pieco had no prepetition right to exercise its walk options other than those it contracted for under Flexleases Nos. 0311–01 and 0311–04. Atlantic concedes that Pieco properly sought to exercise flex options with respect to these Flexleases. Atl.Br. at 22.

In the subsequent reorganization proceedings, Atlantic sought to assume the Master Lease and Equipment Schedules, but to reject the Flexleases. The Bankruptcy Court authorized it to do so, and this appeal followed.

## II.

Pieco presents the following issues for the Court's consideration: (1) did the Bankruptcy Court err in finding that the Master Lease and Equipment Schedules constitute agreements separate and distinct from the Flexleases, so that the Master Lease and Equipment Schedules could be assumed and the Flexleases could be rejected pursuant to 11 U.S.C. § 365(a); and (2) did the Bankruptcy Court err in determining that the Master Lease and Equipment Schedules were executory contracts capable of being assumed pursuant to 11 U.S.C. § 365(a).

## III.

Rule 8013 of the Federal Rules of Bankruptcy Procedure provides that the Bankruptcy Court's findings of fact should not be set aside unless they are found to be "clearly" erroneous. Conclusions of law, on the other hand, are to be reviewed *de novo.* *See, e.g., In re Chateaugay,* 130 B.R. 162, 164 (Bankr.S.D.N.Y.1991). Whether the Master Lease, Equipment Schedules, and Flexleases constitute a single agreement (as six single

ATLANTIC, at the written request of Lessee, will arrange for the Equipment to be replaced by any alternative IBM data processing equipment of equivalent or greater Capital Value (the "IBM Replacement Equipment"), at no penalty to Lessee, as provided below, subject to Atlantic arranging for the IBM Replacement Equipment to be leased to Lessee, under an equipment schedule with a term equal to, at a minimum, the then remaining term of the Equipment Schedule, but not less than twenty-four (24) months and further subject to the following terms and conditions:
(i) six (6) months prior written notice having been given by Lessee to ATLANTIC at its New York office;

(ii) the return of the Equipment in good condition (normal wear and tear excepted); and
(iii) no Event of Default has occurred and is continuing.
These terms and conditions having been duly observed, ATLANTIC will settle in full all further rental and other charges due from Lessee under the Equipment Schedule; provided always, that the IBM Replacement Equipment is leased through ATLANTIC....
Atlantic App., Exs. 5(F)–(G) ¶ 1.

7. As reported by Atlantic, the Flex and Walk Options contained in the Flexleases corresponding to each of the Equipment Schedules matured on the following dates:

| Equipment Schedule | Flex Option | Walk Option |
|---|---|---|
| 0311–02 | 1/30/92 | 1/30/93 |
| 0311–03 | 3/17/92 | 3/17/93 |
| 0311–05 | 9/01/93 | N/A |
| 0311–06 | 11/07/93 | N/A |

Atlantic Br. at 8 n. 3.

agreements, each consisting of the Master Lease and a paired Equipment Schedule and Flexlease) is an issue of fact. *National Union Fire Insurance Company of Pittsburgh, Pa v. Turtur,* 892 F.2d 199, 204 (2d Cir.1989). Whether a contract is ambiguous is a question of law. *Garza v. Marine Transp. Lines, Inc.,* 861 F.2d 23, 27 (2d Cir.1988). Accordingly, the Bankruptcy Court's determination that the agreements are clear and unambiguous is reviewable *de novo.* The question whether the Master Lease and Equipment Schedules were executory on the Petition Date is one of law. *In re Summit Ventures,* 1991 WL 133412 *3 n. 2 (Bankr.D.Vt.); *In re Qintex Entertainment, Inc.,* 950 F.2d 1492, 1495 (9th Cir.1991).

### IV.A.

Pieco's principal argument is that the various lease documents—the Master Lease, the Equipment Schedules, and the Flexleases—constituted a single agreement and were therefore improperly severed by the Court below. In support of this proposition, Pieco asserts that (i) there was no separate consideration flowing to Atlantic on the Flexleases; (ii) the integration clauses of the Master Lease and the Flexleases do not override—and in fact evidence—the unitary nature of the leasing transaction; and (iii) a single contract cannot be assumed in part and rejected in part. In response, Atlantic contends that the language of the various agreements clearly and unambiguously establishes them as distinct agreements and that through the operation of the Master Lease's "hell or high water" clause, Atlantic's right to payment thereunder is absolute. These contentions are taken up below.

One point, however, can be clarified at the outset. Although the language of the parties' briefs is a times ambiguous in this regard, it is clear to the Court that all thirteen of the lease documents—the Master Lease, the six Equipment Schedules, and the six Flexleases—cannot be considered all to comprise one single agreement. At best, from Pieco's perspective, there are six single agreements, each consisting of the Master Lease and one Equipment Schedule and that Equipment Schedule's correspondingly numbered Flexlease. Each of the such six agreements will have been entered into on the date on which the Equipment Schedule and corresponding Flexlease was entered into, the Master Lease being incorporated into each such agreement. The discussion which follows should be understood in this light.

### 1.

■ Beginning with Pieco's last contention, the Court notes that it is elemental that if the various instruments at issue are deemed a single contract, then Atlantic may not assume only the benefits (*i.e.,* payment) while rejecting the obligations of the bargain. As Pieco points out, under Section 365 of the Code, a debtor may not "cherry pick" pieces of contracts it wishes to assume.[8] *See In re Nitec Paper Corp.,* 43 B.R. 492, 498 (Bankr. S.D.N.Y.1984) (citing *Hurley v. Atchison, Topeka & Santa Fe Railway,* 213 U.S. 126, 133, 29 S.Ct. 466, 468, 53 L.Ed. 729 (1909) ("[T]he trustee takes the property of the bankrupt ... in the same plight and condition that the bankrupt himself held it, and subject to all the equities impressed upon it in the hands of the bankrupt....")); *In re Grayson–Robinson Stores, Inc.,* 321 F.2d 500, 502 (2d Cir.1963) (debtor may not repudiate merely obligations while enjoying other bargained for consideration). Thus, if the Bankruptcy Court's conclusion that the various agreements relating to the leasing transactions were severable was clearly erroneous, then—unless for some other reason Pieco's obligations continue even when the agreements are construed as a single contract—the ruling below excusing Atlantic's performance on the Flexleases while requiring Pieco's ongoing lease payments under the Master Lease and the Equipment Schedules must be set aside.

### 2.

■ In arguing that the Bankruptcy Court's finding of separate agreements

---

**8.** Section 365(a) provides:

Except as provided in sections 765 and 766 of this title and in subsections (b), (c) and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

11 U.S.C. § 365(a).

should be reversed, Pieco first contends that the absence of consideration to Atlantic on the Flexleases clearly demonstrates that the Flexleases had no independent identity. In effect, Pieco argues, consideration on the Flexleases can be found only by looking to the payments due under the Equipment Schedules and Master Lease.

Atlantic, on the other hand, maintains that sufficient consideration supported the Flexleases in order to justify their being found separate agreements. In this regard, Atlantic points to Pieco's purported promise to enter into a new lease subsequent to rejection of the old Equipment Schedules, and its obligation to return the used equipment in good condition. Atlantic Br. at 19. In oral argument, however, Atlantic conceded that it received no up front charge for the Flexleases beyond what it earned under the corresponding Equipment Schedules. Transcript of *Pieco, Inc. v. Atlantic Computer Systems, Inc.*, Civ. No. 93–5733 (Feb. 10, 1994) at 33. Atlantic did urge, on the other hand, that its right to the early return of the equipment in question constituted valuable consideration because such return would have allowed it to re-rent the equipment.

Atlantic's arguments do not persuade. First, Atlantic had no assurance that Pieco would in fact exercise its flex rights to enter into a new, more expensive lease, and the Court finds no evidence of any "promise" by Pieco to enter into a new lease. Moreover, the exercise of the "walk" option alone could operate only to Atlantic's disadvantage: in such an event Atlantic would have been left with equipment older and more worn than that which it had originally leased; if it could then have re-rented the now used equipment at a rate even equal to that which it had earned under the original Equipment Schedule with Pieco, it would have had to have

considered itself fortunate. Thus, the return of the used equipment—far from constituting valuable consideration—would at best enable mitigation of the loss that Atlantic would experience in the event of Pieco's exercise of its walk option. Atlantic has indicated to the Court the existence of no economically plausible consideration flowing to Atlantic that may be found solely within the confines of the Flexleases, and without reference to the other instruments of the transaction.[9] Rather, Atlantic retreats to argue simply that identifiable consideration was to be found under the *Equipment Schedules,* Atlantic Br. at 19, and that the Flexleases were not "designed" to be assigned to a lender, points which are, respectively, not in dispute and irrelevant to the issue of consideration.

It might, however, be argued (although Atlantic did not) that the consideration flowing to Atlantic was the *potential* opportunity to receive enhanced rentals from an upgraded rental agreement. Such a contention would be persuasive only with respect to Flexleases Nos. 0311–05 and 0311–06, which provide for equipment upgrades only, without a corresponding walk provision. *See supra* nn. 6–7. However, given the inclusion of the walk option in the prior Flexleases, and the concomitant obligation of Atlantic to settle any of Pieco's rental obligations under the old Equipment Schedule, it is inconceivable that a party that had not received the benefits of the Master Lease and the Equipment Schedules would have subjected itself to the walk risk. Thus, even considering the possibility of contingent consideration flowing to Atlantic under Flexleases Nos. 0311–01 through 0311–04, these instruments do not make economic sense taken alone; only in Flexleases Nos. 0311–05 and 0311–06 would the Court be able to find plausible consideration on this theory.

9. In addition to the rent payable to Atlantic under the Equipment Schedules, the Court does find it plausible that the real consideration for the Flexleases flowing to Atlantic may have included Pieco's consent to make unconditional payments to an assignee in order to "grease" the transaction by enabling Atlantic to attract the financing which made it possible for Pieco to be supplied with relatively state of the art equipment it would otherwise have been unable to obtain. Transcript of *In the Matter of Atlantic,*

*Inc.,* Case No. 90 B 12117 (July 2, 1991) ("Test Case Tr.") at 70. However, here too, this consideration is identifiable only by reference to the other documents to the transaction. Thus, while it is plausible to the Court that the parties may have intended to provide for rent payments secure enough to satisfy a lender in order to enable the financing of the transaction, it cannot be said—judging from the flows of consideration— that this was accomplished by the execution of three independent agreements.

Accordingly, the Court finds the Bankruptcy Court's finding of separate agreements clearly erroneous with regard to Equipment Schedules/Flexleases Nos. 0311–01 through 0311–04, by reason of the lack of consideration to Atlantic in the Flexleases considered as separate agreements.

### 3.

■ Pieco additionally argues in support of its claim that the Master Lease and the respective Equipment Schedules and Flexleases should be construed together as single agreements, that the integration clauses in the Master Lease and the Flexleases do not alter the unitary nature of the transactions. Specifically, Pieco urges that despite the inclusion of the "separate agreement" language of the Flexlease integration clauses, Atlantic App., Exs. 5(B)–(G) ¶ 4, the various documents were entered into pursuant to a single transaction and can be understood only as a whole. The gist of Pieco's argument is thus that the structural nature of the transaction is in conflict with the apparent meaning of specific contractual provisions. Pieco asserts that the Flexleases, considered in isolation, are meaningless, Pieco Br. at 26, and that it would not have entered into any of the agreements but for the inclusion of the Flexleases. Pieco Br. at 16 n. 5. Pieco additionally claims that the integration clauses, even taken by themselves, are not sufficiently clear to support a finding that the agreements were separate absent the consideration of parole evidence.

In support of its structural argument, Pieco argues that under New York law, instruments executed contemporaneously by the same parties, for the same purpose, and in the course of the same transaction are to be read and interpreted together, even "despite facially absolute language" to the contrary in one of the agreements. *Carvel Corp. v. Diversified Management Group,* 930 F.2d 228, 233 n. 2 (2d Cir.1991). Indeed, in *Carvel,* where the Second Circuit ruled that a contemporaneously executed promissory note and distributor agreement were to be treated as a single contract, the court reasoned:

> The promissory notes were executed for the sole purpose of making payments under the distribution agreement.... Under New York law, instruments executed at the same time, by the same parties, for the same purpose and in the course of the same transaction will be read and interpreted together. Thus we conclude that Carvel is not entitled to recovery on the promissory note without reference to the distributorship agreement.

*Id.* at 233. Thus, even where parties executed a distinct promissory note, the coincident circumstances of its execution required construction of the note with reference to other contemporaneously executed instruments. *See also Storwal International, Inc. v. Thom Rock Realty Company,* 768 F.Supp. 429 (S.D.N.Y.1991) (presence or lack of ambiguity must be gleaned from review of the entire document, not merely a single clause); *Burger King Corp. v. Horn & Hardart Co.,* 893 F.2d 525, 527 (2d Cir.1990) (ambiguity exists where an agreement read in its entirety is susceptible of more than one reasonable interpretation); *Williams v. Mobil Oil Corp.,* 83 A.D.2d 434, 445 N.Y.S.2d 172, 175 (N.Y.2d Dept.1981) (ultimate analysis is "whether the parties assented to all the promises as a whole, so that there would have been no bargain if any promise or set of promises had been stricken....") (citation omitted); *Neal v. Hardee's Food Systems, Inc.,* 918 F.2d 34, 37 (5th Cir.1990) ("Under general principles of contract law, separate agreements executed contemporaneously by the same parties, for the same purposes, and as part of the same transaction, are to be construed together"); *Clayton v. Howard Johnson Franchise Systems, Inc.,* 954 F.2d 645, 648–50 (11th Cir.1992) (two or more documents executed by the same parties, at or near the same time, and concerning the same transaction or subject matter are generally construed together as a single contract); *In re Gardinier, Inc.,* 831 F.2d 974, 976 (11th Cir.1987) (setting out three-part test to determine structural interrelatedness); *In re TAK Broadcasting Corp.,* 137 B.R. 728 (Bankr. W.D.Wisc.1992) (leases held to be part of larger transaction and not rejectable by debtor/lessor).

Atlantic's attempt to distinguish the applicable case law from the matter at hand is not convincing. For instance, in *Clayton,* which

Atlantic emphasizes, a motel license and restaurant lease were executed on the same date between the same parties. The separate contract documents, which concerned the operation of related businesses situated contiguously on the same parcel of land, contained numerous cross references and other evidence that they were functionally intertwined, and accordingly the court construed the documents together as a single agreement. In the case at bar, the documents at issue were similarly executed contemporaneously and contain ample cross references.[10] Moreover, whereas *Clayton* involved distinct agreements concerning two different business activities, the undisputed subject matter of the Flexleases and the Equipment Schedules were the identical pieces of computer equipment. Thus, in the instant case, the facts provide even more support for a finding of functional interrelatedness than those underlying *Clayton.*

Atlantic similarly seeks to cast doubt upon the significance of *Curry Road, Ltd. v. K Mart Corp.,* 893 F.2d 509 (2d Cir.1990), also cited by Pieco, by quoting the following passage:

> A term is ambiguous when it is 'capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.' ... Conversely, '[c]ontract language is not ambiguous if it has a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.'

*Id.* at 511 (citations and some quotation marks omitted). In so doing, Atlantic presumably seeks to emphasize those portions of the quotation which state that "contract language is not ambiguous if it has a definite and precise meaning," or unless it is "capable of more than one meaning when viewed objectively by a reasonably intelligent person." *Id.* However, in the same passage, *Curry Road* also states that in determining whether ambiguity exists, reference is to be made to "the context of the entire integrated agreement." *Id.* Thus, the individual terms of an agreement need not be intrinsically unclear or imprecise in order for an agreement to be ambiguous; rather, an agreement may be ambiguous simply by reference to other terms of the agreement. *Id.* By demonstrating only the clarity of various contract provisions in isolation, Atlantic has failed to acknowledge the contextual basis for finding ambiguous those portions of the agreements on which it seeks to rely.[11]

Moreover, even by the terms of the specific contract provisions indicated by Atlantic, the Court is required to look to the entire agreement. For instance, Atlantic emphasizes that the Master Lease's integration clause "clearly and unambiguously" states that the Master Lease "constitutes the entire agreement between the Lessor and the Lessee with respect to the subject matter hereof." Atlantic App., Ex. 5(A) ¶ 23. The "entire agreement" language, however, is qualified by the terms of the integration clause itself, which also provides the condition "except if amended in writing by the parties." *Id.* Certainly the Flexleases on their face qualify as such an amendment. Thus, even under the terms of the provision thus cited by Atlantic, the Court must look to the totality of the transaction.

---

**10.** Pieco asks the Court to consider the following items as contradicting the separate nature of the Flexleases as asserted by Atlantic: (1) the cross references to the Master Lease and/or the Equipment Schedules in the preamble and every enumerated paragraph of the Flexleases; (2) the adoption of the terms defined in the Master Lease; (3) the statement that the Flexleases supersede all prior agreements other than the Master Lease and the Equipment Schedules; (4) Pieco's rights under the Flexleases being expressly contingent on no continuing default by Pieco under the Master Lease and Equipment Sched-

ules; and (5) the integration clause which states that it is not an amendment to the Equipment Schedules but leaves open the possibility that it may be interpreted to constitute an amendment to the Master Lease.

Pieco Reply at 12.

**11.** In fact, Atlantic seems to contend that the inquiry whether a contract's meaning may be considered ambiguous ends if the document employs "words" that have a definite and precise meaning. Atlantic Br. at 15.

Atlantic also argues that the presence of the hell or high water clause, *see supra* n. 2, also mandates a finding of separate agreements. The Court disagrees. Even assuming *arguendo* the full effectiveness of the hell or high water clause, its presence nonetheless does not bear on the issue of the unitary nature of the agreements. Construed in the light most favorable to Atlantic, the hell or high water clause provides only for Pieco's absolute obligation to continue payment regardless of Atlantic's performance under the Flexleases; it is, however, silent on the question of whether the agreements are single in nature. Moreover, although the hell or high water clause may, taken alone, be clear on its face, viewed in the context of the entire agreement, considerable doubt is cast on the assertedly absolute nature of the provision.

In this regard, the most significant flaw in Atlantic's contention that the Bankruptcy Court was correct in holding that the agreements' distinct identities were clear and unambiguous, it seems to this Court, is the difficulty in reconciling the facially absolute meaning of the hell or high water clause with the termination rights afforded Pieco under the Flexleases. Thus, regardless of whether the termination rights granted to Pieco may have matured pre-petition, that they were granted at all is contrary to the purportedly unconditional language of the hell or high water clause. This disparity undercuts the unconditionality of the hell or high water clause and additionally provides the textual ambiguity Atlantic seems to claim is required before the Court may consider the "functional" aspects of the agreements entered into or other extrinsic evidence. Atlantic Br. at 14–15. Moreover, even the upgrade provisions by themselves, it is arguable, made payment under the terms of the underlying Equipment Schedules conditional, not absolute as stated by the terms of the hell or high water clause.

The cases cited by Atlantic to support its view of the primacy of the hell or high water clause do not settle the matter. Although Atlantic has cited numerous cases which ostensibly support the proposition that Atlantic's non-performance on the Flexleases did not relieve Pieco from the requirements of the hell or high water clause, Atlantic has not provided the Court with authority for the proposition that when such a clause conflicts with another provision of a transaction—here, principally, the "walk" provision of the Flexleases—it is the hell or high water clause that must prevail.[12]

Atlantic's recitation of the economic purpose of the hell or high water clause—to allow financing—is similarly unavailing. The concerns of the lenders—not parties to the contracts or this lawsuit—cannot resolve the issue.[13] Thus, the Court cannot consider At-

---

**12.** *See, e.g., National Equipment Rental Ltd. v. J & I Carting, Inc.,* 73 A.D.2d 666, 423 N.Y.S.2d 205 (N.Y.2d Dept.1979) (finding that lease *unambiguously* shifted entire risk of loss); *In re O.P.M. Leasing Services, Inc.,* 21 B.R. 993 (Bankr. S.D.N.Y.1982) (Lifland, J.) (*"O.P.M. I"*) (parole evidence considered prior to deciding that hell or high water clause was enforceable).

Atlantic also seeks to draw support for its position from *Colorado Interstate Corp. v. CIT Group/Equipment Financing, Inc.,* 993 F.2d 743 (10th Cir.1993). The Court notes, however, that that decision, upholding the enforceability of a hell or high water clause, was squarely based on Texas law. In addition, the Tenth Circuit case was based in part on the determination that the disturbance of the lessee's right of quiet enjoyment was insufficient to preclude the functioning of the hell or high water clause. By contrast, in the case before the Court, the Flexleases imposed substantive obligations which were plausibly interdependent with Atlantic's rights to receive rental payments. Moreover, to the extent that *Colorado Interstate* may be construed to indicate the unambiguous supremacy of the hell or high water clause in the agreements at issue, the Courts in this Circuit are not bound by its teaching.

**13.** Compare Judge Lifland's concerns as set out in *O.P.M. I:*

The essential practical consideration requiring liability as a matter of law in these situations is that these clauses are essential to the equipment leasing industry. To deny their effect as a matter of law would seriously chill business in this industry because it is by means of these clauses that a prospective financier-assignee of rental payments is guaranteed meaningful security for his outright loan to the lessor.

21 B.R. at 1007.

Such economic concerns, however, cannot by themselves override the rights of parties to a contract. If unconditional payments are indeed essential to the computer equipment leasing industry, then they can be provided for in unambiguous terms so that reviewing courts can be assured that the conditions set forth in such

lantic's representations that Pieco entered into the agreements with "explicit prior knowledge and consent," Atlantic Br. at 3, with respect to the full enforceability of the hell or high water clause, without the admission of parole evidence.[14]

As a final matter on the question of the separateness of the agreements, the Court must consider both the choice and application by the Bankruptcy Court of the test it employed in determining the separateness of the agreements in the "test case" it heard regarding similarly situated customers of Atlantic. Test Case Tr. at 71–73. Although the ruling in that case is not itself before this Court, nevertheless, because Atlantic often relies on its reasoning, the analysis therein warrants comment. In this regard, the Court notes as an initial matter that the Bankruptcy Court relied on an Eleventh Circuit ruling, *In re Gardinier, Inc.*, 831 F.2d 974 (11th Cir.1987), when applicable precedent concerning determinations of separateness of agreements exists in the Second Circuit. *See Carvel*, 930 F.2d 228. Moreover, this Court does not find the Bankruptcy Court's application of the principles enunciated in *Gardinier* to the transactions at issue to be correct.

In *Gardinier*, the court found that two contracts—one for the sale of real property, the other to pay a broker in connection with that sale—had been created by a single instrument. There, the Eleventh Circuit considered three factors in deciding whether the

agreement before it was indeed one contract: (1) whether the nature and purpose of the agreements are different; (2) whether the consideration for each agreement is separate and distinct; and (3) whether the obligations of each party to the instruments are interrelated. *Id.* at 976. Having found that "the brokerage agreement was separate from the purchase and sale agreement," *id.* at 975 (footnote omitted), it concluded that "the trustee [might] assume the contract for the sale of land and reject the separate brokerage agreement." *Id.* at 978.

With respect to the first prong of the *Gardinier* test, it seems clear to the Court that the nature and purpose of the agreements in the present case were substantially similar; they arose contemporaneously in the same transaction regarding the rental of the same computer equipment. In the face of this clear confluence, the Bankruptcy Court instead emphasized the fact that while the Master Lease and the Equipment Schedules provide for the assignment of rights, there is no assignment clause set out in the Flexlease agreements, and that the Flexleases provide for upgrade and termination rights not included within the other agreements. Test Case Tr. at 71–72. The test, however, is whether the agreements cover the same subject matter, not whether they contain identical provisions. By definition, the agreements each provide for distinct rights and obligations; nonetheless, it is undisputed that they concern the same transaction. *Compare Clayton*, 954 F.2d 645 (contemporane-

clauses are indeed the parties' intent. There is no reason why such a condition could not be expressed in a unified document; on the contrary, a lessor's reliance on the legal technicality of separate pieces of paper to accomplish his end is suggestive that its full intent in the arrangement may not have been apparent to the lessee. True, if such terms are clearly expressed, and if potential Lessees object, they might bargain harder for more favorable terms elsewhere in the equipment leasing contracts, or a deal in fact might not be concluded at all. *See, e.g., Williams*, 445 N.Y.S.2d at 175. That, however, is no concern of the courts. Thus, absent clarity of terms, as understood in light of the entire agreement, lessors will have no alternative but to resort to parole evidence in support of their claims.

**14.** Atlantic makes the additional argument that as a debtor it is entitled to exercise its sound

business judgment in electing whether to assume or reject executory contracts. *See, e.g., NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 522–34, 104 S.Ct. 1188, 1194–1201, 79 L.Ed.2d 482 (1984); *In re O.P.M. Leasing Services, Inc.*, 23 B.R. 104, 118 (Bankr.S.D.N.Y.1982) (Lifland, J.) ("*O.P.M. II*"). This proposition is not in dispute. No claim has been made that Atlantic was not entitled to exercise its business judgment with respect to entire agreements that were executory at the time of its petition. However, Atlantic has failed in any way to explain to this Court how its entitlement to employ its business judgment is a prerogative so powerful as to enable it to assume only portions of a unitary contract, or contracts which are not executory, the issues before the Court on appeal. Atlantic's claim that none of the cases cited by Pieco discuss the business judgment prerogatives of the debtor is irrelevant.

ously executed contracts concerning related but distinct businesses construed as single agreement).

As to the second prong of the test, Atlantic's right to receive the used equipment cannot be thought to constitute economically meaningful consideration. Similarly, Atlantic's obligation to settle Pieco's rental payments in the event of Pieco's exercise of its walk option belies the argument that Atlantic undertook the obligation in exchange for the possibility of an enhanced rental agreement in the future. *See supra* p. 850.

With regard to the third prong of the *Gardinier* test, the Bankruptcy Court concluded that "[a] plain reading of the agreements shows that the obligations under each remains separate and distinct." *Id.* at 73. Surely, however, Pieco's rights under the Flexleases to terminate the corresponding Equipment Schedules or exchange the equipment contracted for evidences an interrelation between the Flexleases and the Equipment Schedules. Nor does the fact that the terms of the Flexleases may have varied among Atlantic's customers (as the Equipments Schedules surely did as well) establish that the various agreements were not "interrelated."

■ Accordingly, the Court finds that the Bankruptcy Court's ruling of separateness as to the agreements involved in all six transactions was clearly erroneous; however, the meaning of the agreements, even when construed together as single agreements, is ambiguous with respect to the weight to be accorded to the hell or high water clause. Therefore, based on the foregoing, the judgment of the Bankruptcy Court is reversed as to its finding of separate contracts, and the case is remanded for consideration of parole evidence on the question of the force to be accorded to the hell or high water clause.[15]

### B.

The Court next turns to Pieco's contention that the Master Lease and Equipment Schedules are not executory contracts capable of assumption under Section 365(a) of the Bankruptcy Code. Pieco has variously contended that these agreements were not assumable because (i) they had been previously terminated by Pieco pre-petition; (ii) they were not executory contracts; and (iii) conditions precedent to assumption set out in Section 365(b)(1) of the Code had not been satisfied. Consideration of whether the agreements were executory indicates that the ruling of the Bankruptcy Court was incorrect in part and correct in part.

### 1.

■ First, Pieco asserts that its pre-petition termination of the Equipment Schedules precluded their assumption pursuant to Rule 365(a). Pieco claims that Atlantic's pre-petition failure to upgrade in accordance with the terms of Flexleases Nos. 0311–01 and 0311–04 effectively terminated the lease agreements and Pieco's corresponding obligations, Pieco Br. at 6, and that because the contracts were terminated pre-petition, they were not capable of assumption by Atlantic. *See, e.g., In re Scarsdale Tires, Inc.,* 47 B.R. 478, 480 (Bankr.S.D.N.Y.1985) (contract terminated pre-petition is unassumable). Pieco asserts that notice of such termination was accomplished by correspondence it sent to Atlantic and its purported assignee. Pieco Br. at 15. *See* Letter from A.E. Brescia to G. Chaplin (May 25, 1990), Atlantic App., Ex. 5(I).

As noted *supra* p. 848, Atlantic concedes that the flex options in Flexleases 0311–01 and 0311–04 were properly exercised pre-petition. Atlantic, however, contends that *only* the flex/walk options with respect to these two flexleases matured pre-petition. In addition, Atlantic asserts that Flexleases Nos. 0311–05 and 0311–06 did not provide for the exercise of termination rights at any time. Atlantic Br. at 22. Pieco, on the other hand, contends that the termination went to the Master Lease itself. Pieco Reply at 7, 14–16.

The Court finds that pre-petition notice of termination was effected only with respect to Equipment Schedules 0311–01 and 0311–04. It is clear that no termination was possible

---

15. *See, e.g., O.P.M. I,* 21 B.R. at 1006 (parole evidence considered in construing effect of hell or high water clause in lease agreement).

with respect to Equipment Schedules 0311–02 and 0311–03 prior to Atlantic's bankruptcy petition because no right to terminate had accrued pre-petition. *See supra* n. 7. It is not at all apparent that Pieco was entitled to "walk" at any time from Equipment Schedules 0311–05 and 0311–06. The Bankruptcy Court's ruling that Equipment Schedules 0311–02, 0311–03, 0311–05 and 0311–06 had not been terminated pre-petition therefore cannot be clearly erroneous. Therefore, only with respect to the assumption of Equipment Schedules 0311–01 and 0311–04 does the Court find that the judgment of the Bankruptcy Court was clearly in error.

### 2.

■ Pieco also claims, however, that the remaining Equipment Schedules were not capable of assumption by Atlantic because these other agreements, read in isolation from the Flexleases (as Atlantic contends they should be) were not executory as of the time of Atlantic's bankruptcy petition.

■ An executory contract is one "under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either party to complete the performance would constitute a material breach, excusing performance of the other." *In re Chateaugay*, 130 B.R. at 164 (citing Countryman, *Executory Contracts in Bankruptcy: Part I*, Minn.L.Rev. 439, 460 (1973)). In other words, in order for a contract to be considered executory, there must be significant performance remaining on both sides. *See, e.g., Bildisco*, 465 U.S. at 522 n. 6, 104 S.Ct. at 1194 n. 6; *In re RLR Celestial Homes, Inc.*, 108 B.R. 36 (Bankr.S.D.N.Y. 1989).

The obligation to make payment alone, Pieco contends, does not rise to the level of "remaining performance" necessary to establish that a contract is executory. Pieco Br.

at 34. *See In re Cornwall Hill Realty, Inc.*, 128 B.R. 378, 381 (Bankr.S.D.N.Y.1991); *see also Chateaugay*, 130 B.R. at 165–66 (where only remaining obligation was to pay for services provided by purchase order, contract's assumption could not be compelled). Similarly, the continuation of an ongoing covenant, such as the guarantee of quiet use, Atlantic Ex. 5(A) ¶ 21, Pieco claims, is also insufficient to make a contract "executory." Pieco Br. at 35. Pieco also asserts that the obligation to return the equipment was a mere formality, and as such, cannot constitute the "remaining performance" necessary for a contract to be construed as "executory." *RLR Celestial Homes, Inc.*, 108 B.R. at 44 (delivery of legal title by seller to purchaser of real estate is mere formality and does not form the basis for determining that a contract was executory) (citation omitted).

Thus, Pieco contends that because Atlantic had already fully performed on the Master Lease and Equipment Schedule when it delivered the computer equipment pre-petition, the Bankruptcy Court erred in finding that the Master Lease and Equipment Schedules were executory and therefore assumable by Atlantic.

■ These arguments are all well and good, but Pieco fails adequately to address the fact that Section 365(a) provides for the assumption or rejection of unexpired leases, as well as executory contracts. The law is not clear, however, whether unexpired leases must, like other contracts, be executory—*i.e.*, with significant performance remaining on both sides—in order to be capable of assumption. Although courts, to the extent they have considered the matter, have tended to find a requirement that even unexpired leases must have significant performance remaining in order to be capable of assumption,[16] the Court believes that there is merit

---

16. *See, e.g., O.P.M. II*, 23 B.R. at 117–18 (rejection of lease upheld in part because of its "clearly executory" nature); *In re Cheney Bros.*, 12 F.Supp. 605, 608 (D.Conn.1935) (finding, in case prior to Bankruptcy Act amendment expressly covering unexpired leases, that "an unexpired lease is in fact an executory contract, and there is nothing in the language of the act which justifies the surmise that Congress did not so regard it," and dismissing landlord's argument that a lease is not an executory contract but an estate in land [case suggestive that subsequent inclusion of unexpired leases in Section 365 was intended merely to preclude the exclusion of leases, not to subject them to a lesser test regarding executory nature] ); *In re TAK Broadcasting*, 137 B.R. at 734 ("a true unexpired lease, like an executory contract, involves mutual obligations and benefits that have not yet been performed or realized").

to the position that such a construction would render superfluous the meaning of "unexpired lease" under Section 365; to adjudge contracts and unexpired leases by the same standard would make Section 365 too often inapplicable to unexpired leases. The essence of a lease's principal remaining obligation is only payment—a factor expressly excluded from consideration in deciding whether non-lease contracts are executory. *See, e.g., Chateaugay*, 130 B.R. at 165–66; *Grayson–Robinson Stores*, 321 F.2d at 502; *In re THC Financial Corp.*, 686 F.2d 799, 804 (9th Cir.1982). The Court also notes that where courts have decided that a lease may not be assumed or rejected pursuant to Section 365, the cases have generally been concerned with whether the agreement at issue was a "true" lease merely because it was designated as a "lease," despite the fact that the lease itself may have functioned more like a financing arrangement or involved insufficient consideration or remaining performance. *See, e.g., International Trade Admin. v. Rensselaer Polytechnic Inst.*, 936 F.2d 744, 748 (2d Cir.1991); *In re PCH Assocs.*, 804 F.2d 193, 198–99 (2d Cir.1986); *In re Shangri–La Nursing Center, Inc.*, 31 B.R. 367, 371 (Bankr.E.D.N.Y.1987).

Applying these considerations, the Court finds that the Equipment Schedules in and of themselves are plausibly construed as unexpired leases. These agreements provided for an economically plausible rent and do not apparently mask any transaction of a different character. The Flexleases, however, cannot be so understood. Because the walk and settlement provisions of Flexleases Nos. 0311–01 through 0311–04 make these Flexleases economically incoherent construed alone, the Flexleases—even assuming the

separateness of the agreements—cannot be executory or "true" leases. They can be understood only in the context of the other agreements, and the fact that no meaningful future performance was required of Pieco in the event of the exercise of the walk provision further signifies that the Flexleases were not executory in nature. *See In re Chateaugay Corp.*, 102 B.R. 335, 348 (Bankr. S.D.N.Y.1989) (where agreements were merely "leases" in name, obligations which were remote, contingent, or *de minimis* were insufficient to render the agreements executory). Moreover, the Flexleases identify no specific rental object, amount or terms of payments.

Therefore, even assuming the separateness of the agreements, the Flexleases, neither executory contracts nor unexpired leases, were improperly rejected below, and the Bankruptcy Court's ruling was clearly erroneous on the basis that the Flexleases were not rejectable under Section 365(a) of the Code.[17]

**3.**

▇ Pieco also argues that the court below failed to make any finding as to whether any conditions precedent to assumption, as required by Section 365(b)(1) of the Code, had been fulfilled. Section 365(b)(1) requires that any default must be cured, or adequate assurance of such cure provided, before an executory contract or unexpired lease may be assumed.[18] Pieco contends that Atlantic's pre-petition default on Flexleases 0311–01 and 0311–04 made the Equipment Schedules and Master Lease incapable of assumption. The Court agrees that Pieco was entitled to such a finding.

**17.** With respect to Flexleases Nos. 0311–05 and 0311–06, on the other hand, because they apparently contained no walk provisions and involved only mutual contingent promises—settlement in exchange for upgrading—had these Flexleases constituted separate agreements, they might have been capable of rejection.

**18.** Section 365(b)(1) provides in full:
If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—

(A) cures, or provides adequate assurance that the trustee will promptly cure, such default;
(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
(C) provides adequate assurance of future performance under such contract or lease.
11 U.S.C. § 365(b)(1).

858

## V.

In sum, Pieco's pre-petition notice of termination of Equipment Schedules 0311–01 and 0311–04 indicates that the holding of the Court below that those Equipment Schedules were properly assumable by Atlantic is clearly in error and is therefore reversed.

With respect to Flexleases Nos. 0311–01 through 0311–04, the Court finds, due to failure of consideration, that these agreements cannot be construed as separate from the corresponding Equipment Schedules. Further, the lack of consideration also precludes any finding that these Flexleases, if construed separately, were executory in nature; thus, these Flexleases were neither distinct nor capable of rejection by Atlantic. Therefore, the Bankruptcy Court's finding of separate, executory agreements is reversed as to Equipment Schedules/Flexlease Nos. 0311–01 through 0311–04. With respect to Flexleases Nos. 0311–05 and 0311–06, although distinct consideration is identifiable, in light of the applicable case law and the totality of the circumstances, including the Flexleases' numerous cross references to, and their contemporaneous execution with, the Equipment Schedules, the court below was clearly in error in finding that these Flexleases constituted distinct agreements.

However, even construed as single agreements, the possibility remains that the parties may have bargained for Pieco's unconditional obligation to make rental payments. Because the Court finds it ambiguous as to whether the hell or high water clause must be given effect notwithstanding the walk and upgrade provisions of the Flexleases, the submission of parole evidence is appropriate.

Therefore, the Bankruptcy Court below may consider parole evidence on the issue of whether Pieco is obligated to undertake rental payments with respect to the Equipment Schedules despite the unitary nature of the Equipment Schedules and the Flexleases, and in so doing will assess the proper weight to be accorded to the hell or high water clause in light of any contrary evidence with regard to each of the various Equipment Schedules and Flexleases and their respective statuses at the time of Atlantic's petition. In addition, before any ruling that the Bankruptcy Court may issue entitling Atlantic to receive further rental payments, Pieco is entitled to findings regarding whether conditions precedent to assumption of contracts were satisfied under Section 365(b)(1) of the Code.

For the foregoing reasons, the order of the court below is reversed, and the case is remanded for reconsideration consistent with this Order.

SO ORDERED.